VECTREN ENERGY DELIVERY OF OHIO, INC., APPELLANT, *v.* PUBLIC UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as *Vectren Energy Delivery of Ohio, Inc. v. Pub. Util. Comm.,* 113 Ohio St.3d 180, 2007-Ohio-1386.]

(No. 2006–0367—Submitted November 28, 2006—Decided April 11, 2007.)

PFEIFER, J.

## Background

{¶ 1} This is an appeal as of right by appellant, Vectren Energy Delivery of Ohio, Inc. ("Vectren"), from orders of the Public Utilities Commission of Ohio ("commission" or "PUCO"). The Office of Consumers' Counsel ("OCC") is an intervening appellee in this appeal.

{¶ 2} Vectren is a natural gas company as defined by R.C. 4905.03(A)(6). Pursuant to R.C. 4905.302, a natural gas company may recover costs incurred in obtaining the gas it sells to customers by adjusting the rates it charges under the gas-cost-recovery clause in the company's rate schedules. The commission has authority to review a company's gas-procurement policies and practices. R.C. 4905.302(C). The PUCO reviewed the gas costs reflected in Vectren's gas-cost-recovery rates and ordered Vectren to refund some costs to the company's customers, as described below.

{¶ 3} Vectren began business as a natural gas company when it acquired the natural gas assets of the Dayton Power & Light Company ("DP & L").[1] Vectren took control of DP & L's assets and assumed DP & L's obligations as a local distributor of natural gas services on November 1, 2000, the day the 2000–2001 winter heating season began.

{¶ 4} Pursuant to R.C. 4905.302 and Ohio Adm.Code 4901:1–14–07(A), the commission ordered an audit to investigate Vectren's gas-cost-recovery rates for the audit period covering November 1, 2000, through October 31, 2002. Liberty Consulting Group ("Liberty") conducted the audit of Vectren and filed a report with the commission on August 15, 2003.

{¶ 5} OCC was permitted to intervene in the proceeding on behalf of Vectren's residential customers. Written testimony was submitted, and an evidentiary hearing was held in November and December 2003. Vectren, the commission's staff, and OCC filed posthearing briefs.

{¶ 6} On June 14, 2005, the commission issued its opinion and order in Vectren's gas-cost-recovery proceeding. The commission found that in certain

---

1. *In the Matter of the Joint Petition of Vectren Energy of Ohio, Inc., Indiana Gas Company, Inc., and the Dayton Power and Light Company, to Transfer the Natural Gas Assets of the Dayton Power and Light Company to Vectren Energy Delivery of Ohio, Inc. and/or Indiana Gas Company, Inc., Pursuant to R.C. Section 4905.48(B) and (C)*, PUCO case No. 00–524–GA–ATR (Mar. 20, 2000).

instances, Vectren had acted unreasonably, imprudently, or inappropriately in procuring gas during the audit period. Specifically, the commission took issue with three winter-delivery service contracts that Vectren had entered into that resulted in unused, excess natural gas capacity during the audit period. The commission also found that the terms of Vectren's asset-management agreement with its affiliate, ProLiance Energy L.L.C. ("ProLiance"), were not prudent, reasonable, or appropriate. The commission concluded that Vectren's customers should not be responsible for the inappropriate excess-capacity costs of the winter-delivery service contracts and that Vectren's customers had been harmed as a result of the ProLiance contract. Accordingly, the commission determined that six adjustments to Vectren's gas-cost-recovery rates were warranted, and it ordered Vectren to refund, by those adjustments, over $9.5 million in gas supply costs that Vectren had previously collected from customers.

{¶ 7} Vectren filed a timely application for rehearing. On August 10, 2005, the commission granted the application in part, finding that Vectren had set forth sufficient reasons to warrant reconsideration of the adjustment related to the ProLiance contract and the calculation of interest of all adjustments in the June 14, 2005 order. The commission reduced the refund owed by Vectren to its customers in connection with the ProLiance contract from $3.83 million to $1.98 million. The commission also changed the date when interest would begin to accrue on the ordered refund.

{¶ 8} Vectren's appeal as of right is now before this court. Based on the following reasons, we affirm the PUCO's orders.

### Standard of Review

{¶ 9} R.C. 4903.13 provides that we may reverse, vacate, or modify a PUCO order only when, upon consideration of the record, we find the order to be unlawful or unreasonable. We will not reverse or modify a PUCO decision as to questions of fact where the record contains sufficient probative evidence to show that the commission's decision was not manifestly against the weight of the evidence and was not so clearly unsupported by the record as to show misapprehension, mistake, or willful disregard of duty. *Monongahela Power Co. v. Pub. Util. Comm.*, 104 Ohio St.3d 571, 2004-Ohio-6896, 820 N.E.2d 921, at ¶ 29. The appellant bears the burden of demonstrating that the PUCO's decision is against the manifest weight of the evidence or is clearly unsupported by the record. Id. Although we have "complete and independent power of review as to all questions of law" in appeals from the PUCO, *Ohio Edison Co. v. Pub. Util. Comm.* (1997), 78 Ohio St.3d 466, 469, 678 N.E.2d 922, we may rely on the expertise of a state agency in interpreting a law where "highly specialized issues" are involved and "where agency expertise would, therefore, be of assistance in discerning the

presumed intent of our General Assembly." *Consumers' Counsel v. Pub. Util. Comm.* (1979), 58 Ohio St.2d 108, 110, 12 O.O.3d 115, 388 N.E.2d 1370.

## Proposition of Law No. I

*Winter Delivery Service–1 and Winter Delivery Service–3 Contracts*

{¶ 10} In its first proposition of law, Vectren challenges the PUCO's finding that it did not act reasonably, prudently, or appropriately when it executed the first winter-delivery service ("WDS–1") contract and the third winter-delivery service ("WDS–3") contract. Vectren argues that its actions in executing these contracts are entitled to a presumption of reasonableness and were based on forecast methods, assumptions, reserves, and resource plans that had been reviewed and approved by the PUCO in proceedings on the company's long-term-forecast reports.

{¶ 11} R.C. 4935.04(C) requires natural gas companies like Vectren to file annually a long-term-forecast report.[2] The purpose of the long-term-forecast report is to project customers' future demands for gas and to determine how to acquire sufficient commodity and pipeline resources to meet demand. See *In the Matter of the Long–Term Forecast Report of Vectren Energy Delivery of Ohio and Related Matters,* PUCO No. 00–120–GA–FOR (Sept. 25, 2001), 2001 WL 1518351, at 3. Among other items, long-term-forecast reports are required to contain a year-by-year ten-year forecast of annual energy demand, peak load, and reserves, and a general description of the resource plan to meet demand. R.C. 4935.04(C)(1). The reports must also contain a projection of anticipated supply, supply prices, and sources of supply over the forecast period. R.C. 4935.04(C)(4).

{¶ 12} R.C. 4935.04(D)(1) requires the PUCO to review and comment on long-term-forecast reports, and subsection (D)(3) requires that a hearing be held at least once every five years. The scope of the hearing is "limited to issues relating to forecasting." R.C. 4935.04(E)(1).

{¶ 13} Under R.C. 4935.04(F), the PUCO shall determine whether the following are true:

{¶ 14} "(2) The load requirements are based on substantially accurate historical information and adequate methodology;

{¶ 15} "(3) The forecasting methods consider the relationship between price and energy consumption;

{¶ 16} "(4) The report identifies and projects reductions in energy demands due to energy conservation measures * * * in the [utility's] service area;

---

2. R.C. 4935.04 was modified during the audit period, but the modifications do not affect this matter.

{¶ 17} "(5) Utility company forecasts of loads and resources are reasonable in relation to population growth estimates * * *;

{¶ 18} " * * *

{¶ 19} "(7) All assumptions made in the forecast are reasonable and adequately documented."

{¶ 20} During the gas-cost-recovery audit period under review in this matter—November 1, 2000, through October 31, 2002—the PUCO approved the 2000 long-term-forecast report filed by Vectren and determined that no hearings were required on the 2001 and 2002 reports.[3]

{¶ 21} Vectren claimed that it entered into the WDS–1 and WDS–3 contracts to meet design-day [4] forecasting requirements and a reserve margin that were set forth in its 2000 and 2001 long-term-forecast reports. Vectren passed the demand and commodity costs of these contracts through to its customers who were subject to gas-cost recovery. The PUCO found, however, that Vectren's forecasting methodology was too conservative and that its use of a five-percent reserve margin was improper. The PUCO, therefore, concluded that the WDS–1 and WDS–3 contracts resulted in inappropriate excess-capacity costs to Vectren's customers in the amount of $2,387,965.

{¶ 22} *Statutory authority.* Vectren first argues that in gas-cost-recovery proceedings the PUCO has no statutory authority to conduct a de novo consideration of issues that were open to investigation in long-term-forecast proceedings. Vectren claims that the PUCO erred when it overturned, in this gas-cost-recovery proceeding, its prior findings, in Vectren's long-term-forecast proceedings, that Vectren's forecasting assumptions and methodology were reasonable.

{¶ 23} The PUCO found that Vectren had misinterpreted the intent and purpose of long-term-forecast reports under R.C. 4935.04 and gas-cost-recovery proceedings under R.C. 4905.302. The PUCO held that it was not barred from addressing issues regarding Vectren's forecast assumptions and methodology set forth in its long-term-forecast reports for purposes of reviewing Vectren's gas purchases during the audit period. The PUCO recognized the purpose and interrelationship of long-term-forecast reports and gas-cost-recovery audits but found that the purpose of each proceeding is different. The PUCO noted that

---

3. See *In the Matter of the Long–Term Forecast Report of Vectren Energy Delivery of Ohio and Related Matters,* PUCO No. 00–120–GA–FOR, 2001 WL 1518351 (Sept. 25, 2001); *In the Matter of the Long–Term Gas Forecast Report of Vectren Energy Delivery of Ohio, Inc.,* PUCO No. 01–320–GA–FOR (Oct. 4, 2001); and PUCO No. 02–120–GA–FOR, 2002 WL 32093811 (Aug. 22, 2002).

4. "Design day" means "[a] 24–hour period of demand which is used as a basis for planning gas capacity requirements." American Gas Association Glossary, http://www.aga.org; and Ohio Adm. Code 4901:5–7–01(A).

the purpose of proceedings on long-term-forecast reports under R.C. 4935.04 is "to require energy utilities to prospectively plan for a sufficient supply based on projected demand and to demonstrate that such a process has been adequately implemented by the reporting utility. The [long-term-forecast reports] are primarily for the utilities' planning purposes."

{¶ 24} In contrast, the PUCO stated that in R.C. 4905.302 gas-cost-recovery proceedings, it "performs audits to determine, among other things, if a gas or natural gas company has acted unreasonably or imprudently with its gas procurement policies and/or practices." Thus, although "Vectren's use of a reserve margin, its propane inventory and design-day criteria were part of its long-term planning in [its long-term-forecast reports], * * * the prudence and reasonableness of the effect of such decisions on Vectren's gas procurement policies were not and have not been evaluated in the [long-term-forecast] proceedings. The appropriate proceeding for review of Vectren's gas procurement policies and practices is the [gas-cost-recovery] audit."

{¶ 25} R.C. 4905.302 is designed to separate the cost of gas from all other costs incurred by a natural gas company and to permit the company to recover the costs of its gas supplies from its customers. See *River Gas Co. v. Pub. Util. Comm.* (1982), 69 Ohio St.2d 509, 510, 23 O.O.3d 443, 433 N.E.2d 568. The PUCO may refuse to permit the recovery of gas costs if it has reason to believe that the company "has followed imprudent or unreasonable procurement policies and practices, * * * or has employed such other practices, policies, or factors as the commission considers inappropriate." R.C. 4905.302(E).

{¶ 26} Ohio Adm.Code Chapter 4901:1–14 establishes a "gas cost recovery process" and "investigative procedures and proceedings, including periodic reports, audits, and hearings, to examine the arithmetic and accounting accuracy of the gas costs reflected in each company's gas cost recovery rate, and to review each company's gas production and purchasing policies to the extent that those policies affect the gas cost recovery rate." Ohio Adm.Code 4901:1–14–02. See, also, R.C. 4905.302(C)(1).

{¶ 27} Vectren has cited no statute or commission rule that precludes the PUCO from reviewing, in a gas-cost-recovery proceeding, its forecasting methodology (including design-day specifications) in order to determine whether they correspond to the company's service requirements. Indeed, the above-quoted language indicates that the PUCO is well within its authority to review forecasting assumptions and methodology in gas-cost-recovery proceedings. Vectren's long-term-forecast reports would necessarily have an effect upon its purchasing policies and practices and thus are appropriate for the PUCO's review during gas-cost-recovery proceedings. In fact, the PUCO conducted such a review of DP & L's forecasting methodology and assumptions in DP & L's gas-cost-

recovery case (which Vectren was a party to) that covered the audit period just prior to DP & L's transfer of assets to Vectren. See *In the Matter of the Regulation of the Purchased Gas Adjustment Clause Contained within the Rate Schedule of Vectren Energy Delivery of Ohio, Inc. and Related Matters*, PUCO No. 00–220–GA–GCR, 2001 WL 1518351, at 7–9.

{¶ 28} Notwithstanding, Vectren asks us to hold that the commission may not find under R.C. 4905.302 that a utility acted imprudently—and thereby deny its recovery of gas costs—merely because the utility has purchased enough gas supply to meet the demand forecasts that the PUCO previously reviewed and approved in accordance with R.C. Chapter 4935. In other words, Vectren maintains that as long as it follows a supply plan dictated by forecasting methodology and assumptions set forth in its long-term-forecast report and approved by the PUCO, then its gas costs can never be found imprudent. But Vectren's reasoning ignores the difference between forecast demand and actual demand. Indeed, Vectren acknowledged the difference in its 2000 long-term-forecast report when it noted that "the demand forecasting process although detailed * * * is a forecast and will have variances when compared to actual demand."

{¶ 29} ***Res Judicata/Collateral Estoppel.*** Vectren also asserts under its first proposition of law that the PUCO's findings regarding Vectren's long-term-forecast reports foreclosed all claims on the forecast assumptions and methodology based on the doctrines of res judicata and collateral estoppel. According to Vectren, the PUCO's disallowance of the costs of the WDS–1 and WDS–3 contracts was unlawful because it was ultimately based upon the PUCO's re-evaluation of forecasting methods, particularly its design-day specifications, previously approved by the PUCO in Vectren's long-term-forecast reports.

{¶ 30} The doctrines of res judicata and collateral estoppel preclude relitigation of a point of law or fact that was at issue in a former action between the same parties and was passed upon by a court of competent jurisdiction. See *Consumers' Counsel v. Pub. Util. Comm.* (1985), 16 Ohio St.3d 9, 10, 16 OBR 361, 475 N.E.2d 782, citing *Trautwein v. Sorgenfrei* (1979), 58 Ohio St.2d 493, 12 O.O.3d 403, 391 N.E.2d 326, syllabus. Neither doctrine is applicable here because there was no relitigation in Vectren's gas-cost-recovery proceeding of a point of law or fact that was passed upon by the PUCO in proceedings on Vectren's long-term-forecast reports.

{¶ 31} In the proceeding on Vectren's 2000 long-term-forecast report, the PUCO approved a stipulation signed by Vectren, OCC, and the PUCO staff that Vectren's long-term-forecast report substantially complied with the requirements of R.C. Chapter 4935. Nothing in the PUCO's order indicates that it conclusively decided all issues regarding Vectren's forecasting methods or design-day criteria.

The PUCO did not engage in any evaluation or make any specific endorsement of Vectren's forecasting methodology or design-day specifications.

{¶ 32} Similarly, the PUCO closed the proceedings on Vectren's 2001 long-term-forecast report in October 2001. In doing so, the PUCO specifically noted that it was "not making any judgment or reaching any conclusion as to the reports or data submitted" by Vectren in that case. *In the Matter of the Long–Term Gas Forecast Report of Vectren Energy Delivery of Ohio, Inc.,* PUCO No. 01–320–GA–FOR (Oct. 4, 2001). Thus, we find that Vectren's claim is not supported by the record.

{¶ 33} Vectren also overlooks the fact that the PUCO's findings that the WDS–1 and WDS–3 contracts were imprudent were not based solely on its determination that Vectren's forecasting methodology was overly conservative (resulting in higher design-day requirements). The PUCO found that Vectren's forecast need and the volume obtained under the WDS–1 contract would be appropriate only if the PUCO included the five-percent reserve margin[5] on top of Vectren's 2000 design-day requirements. Similarly, the PUCO concluded that the WDS–3 contract resulted in inappropriate excess-capacity costs when it determined that a five-percent reserve margin on top of the 2001 forecasted design-day needs was not warranted. Thus, "[i]t was the cumulative effect of Vectren's very conservative design day requirements combined with a five percent reserve margin" when compared to customer demand that caused the commission to conclude that inappropriate excess-capacity costs were passed on to Vectren's customers.

{¶ 34} Vectren suggests that any claims involving its implementation of a five-percent reserve margin were barred by res judicata or collateral estoppel. The PUCO held, however, that it had never endorsed Vectren's decision to implement a *five-percent* reserve margin in any previous proceeding. The PUCO found that Vectren's 2000 long-term-forecast report did not include any specific reserve margin, noting that the 2000 report referred to a reserve margin without quantifying a percentage.

{¶ 35} Therefore, even if proceedings on Vectren's long-term-forecast reports established the reasonableness of Vectren's forecasting methodology as Vectren contends, Vectren's claim still must fail because the PUCO held that the volumes under the WDS–1 and WDS–3 contracts could be justified only by including the five-percent reserve margin. Vectren has offered no credible evidence that the PUCO approved a five-percent reserve margin in any of the proceedings on

---

5. A reserve margin is maintained in the event of a shortfall in peak-day supply resulting from a supplier or facility failure. However, Vectren's design-day equation included a margin of error in addition to its proposed five-percent reserve margin.

Vectren's long-term-forecast reports or that the PUCO erred in finding that Vectren's use of a reserve margin was not warranted.

{¶ 36} We conclude that Vectren has failed to establish that the PUCO's decision on this issue was unlawful, unreasonable, or against the manifest weight of the evidence. Accordingly, we defer to the commission's statutory interpretations and reject Vectren's first proposition of law. *Migden–Ostrander v. Pub. Util. Comm.,* 102 Ohio St.3d 451, 2004-Ohio-3924, 812 N.E.2d 955, at ¶ 23.

### Proposition of Law No. II

*Winter–Delivery Service–2 Contract*

{¶ 37} In proposition of law No. II, Vectren contends that the PUCO erred when it determined that Vectren did not act reasonably, prudently, or appropriately by executing the second winter-delivery service ("WDS–2") contract. Vectren argues that the PUCO's decision was unreasonable, unlawful, and against the manifest weight of the evidence and that it failed to comply with R.C. 4903.09.[6]

{¶ 38} Within two months before the asset transfer between DP & L and Vectren, DP & L sold 1.5 million gallons of propane, arguably in violation of its obligation to Vectren to act in accordance with good utility practices in the transfer of assets.[7] Vectren elected not to delay the DP & L asset-purchase transaction and, for the sake of its business relationship with DP & L, chose to forgo a legal dispute over the depleted propane inventory. Vectren instead obtained natural gas through the WDS–2 contract to replace the propane sold by DP & L.

{¶ 39} The PUCO held that Vectren did not act prudently, reasonably, or appropriately when it executed the WDS–2 contract. The PUCO reasoned that the volume that Vectren obtained under the WDS–1 contract—which Vectren had executed just prior to the WDS–2 contract—and the remaining propane inventory could have covered the same concerns (depleted propane inventory and extreme November–December 2000 weather conditions) that Vectren advanced to justify the WDS–2 contract. The PUCO noted that Vectren failed to explain why it did not use its remaining propane on hand or the natural gas volume from the WDS–1 contract. Moreover, the PUCO found that under the WDS–2 contract, Vectren obtained the equivalent of nearly 26 times the amount of the missing propane and

---

6. R.C. 4903.09 requires that the commission issue "findings of fact and written opinions setting forth the reasons prompting the decisions arrived at, based upon said findings of fact."

7. Propane can be used to meet customer needs on the coldest days. Vectren uses propane as a complement to natural gas to meet peak demands and to avoid exceeding hourly pipeline limitations.

that Vectren provided no explanation to justify a contract that was much larger than the main reason for its existence. According to the PUCO, Vectren's handling of the WDS–2 contract doubled the winter-demand service costs to its customers.

{¶ 40} The PUCO also held that Vectren improperly shifted, from Vectren's shareholders to Vectren's customers, the costs incurred in replacing the reserve represented by the propane removed by DP & L. The PUCO found that the risks associated with Vectren's business decision not to pursue the propane-depletion issue with DP & L prior to closing on the asset-transfer transaction should not be borne by Vectren's customers.

{¶ 41} Vectren disputes the PUCO's determination that Vectren offered no justification for obtaining the equivalent of nearly 26 times the amount of the missing propane. Vectren maintains that it attempted to obtain a ten-day service contract but that suppliers were willing to provide only 60–day service contracts. According to Vectren, the PUCO refused to recognize that the 60–day service contract was dictated by the market. Vectren, however, has offered no evidence to support its claim. Vectren refers to written testimony from one of its witnesses, but this witness testified that the volume obtained through the WDS–2 contract was justified by Vectren's annual-supply plan. Vectren's witness mentioned nothing about market conditions; rather, he testified that Vectren "exercised judgment and secured supply it determined to be needed."

{¶ 42} Vectren also challenges the PUCO's reason for disallowing the WDS–2 contract: in Vectren's words, "that there was enough propane in [Vectren's] system to cover the need [Vectren] satisfied through the WDS–2 contract and that [Vectren's] propane facilities were being used at only one-half capacity." Vectren has again failed to offer record evidence that the factual findings it disputes are in error. In addition, the PUCO never said that Vectren had enough propane on hand to cover the need satisfied through the WDS–2 contract. Rather, the PUCO found that the "WDS–1 contract *and* the remaining propane could have covered the same concerns that Vectren advances to justify the WDS–2 contract." (Emphasis added.) This and the fact that the natural gas supply obtained under the WDS–2 contract was the equivalent of nearly 26 times the amount of the missing propane it was intended to replace were the primary reasons that the PUCO found that the WDS–2 contract was imprudent.

{¶ 43} Vectren also challenges the PUCO's ordered adjustment of $556,437, which reflected the difference between the cost of the commodity purchased under the WDS–2 contract and the market price to replace the missing propane inventory at or near the time of the transfer. Vectren maintains that this refund must be overturned because it was based on the assumption that Vectren could have used propane on the days that the WDS–2 gas supply was actually used.

We disagree. The PUCO did not assume anything; instead, Vectren admitted that if the propane had been available during the 2000–2001 winter heating season, Vectren would have used it to meet customer demand.

{¶ 44} Finally, Vectren claims that "the Commission's suggestion that [Vectren's] shareholders somehow made money is erroneous, as a matter of law, and had nothing to do with [Vectren's] decision-making." It is not clear to us how this "suggestion," assuming its existence, is erroneous as a matter of *law*. In any event, the PUCO merely held that Vectren's customers should not be saddled with the cost of replacing the propane inventory sold off by DP & L when Vectren made a business decision to go forward with the asset transfer rather than pursue the issue of the depleted propane inventory with DP & L.

{¶ 45} Vectren has not shown that the PUCO's decision was unlawful, unreasonable, or against the manifest weight of the evidence. We overrule the second proposition of law.

### Proposition of Law No. III

{¶ 46} In its third proposition of law, Vectren contends that the PUCO unlawfully permitted its staff to participate in the proceedings without filing a report or testimony. Vectren made this argument before the commission in a motion to strike the staff's posthearing briefs. Vectren argued that, pursuant to R.C. 4901.16, the staff must present any information it acquires in a report to the commission or in testimony in commission proceedings. Because the staff did not present a report or testimony, Vectren maintains that the PUCO was precluded from considering the staff's briefs as a basis for any decision. The commission, however, found that R.C. 4901.16 did not apply to the staff's posthearing briefs and that the staff, like other parties, was permitted to participate in this proceeding pursuant to R.C. 4903.02.

{¶ 47} Vectren now asserts that the PUCO's determination that its staff was another party that participated in this proceeding "like the other parties" is unreasonable and that the multiple roles played by the staff produced a process that is contrary to law and fundamentally unfair. Vectren takes issue with the PUCO's finding that it was within the staff's prerogative not to submit testimony in support of its positions in the proceedings before the commission. Yet R.C. 4903.02 provides:

{¶ 48} "The public utilities commission may, either through the public utilities commissioners or by inspectors or employees authorized by it, examine under oath, at any time and for assisting the commission in the performance of any powers or duties of the commission, any officer, agent, or employee of any public utility or railroad or any other person, in relation to the business and affairs of

such public utility or railroad and may compel the attendance of such witness for the purpose of such examination."

{¶ 49} The commission has broad authority in the conduct of its hearings and "may adopt and publish rules to govern its proceedings and to regulate the mode and manner of all * * * hearings relating to parties before it." R.C. 4901.13; *Weiss v. Pub. Util. Comm.* (2000), 90 Ohio St.3d 15, 19, 734 N.E.2d 775. The commission may "permit or require the filing of briefs or memoranda at any time during a proceeding." Ohio Adm.Code 4901–1–31(A). Further, the commission's staff is considered a party for purposes of the briefing rule. Ohio Adm.Code 4901–1–10(C). The PUCO was well within its authority to permit its staff to cross-examine witnesses and file posthearing briefs.

{¶ 50} Notwithstanding this authority, Vectren maintains that "[b]ecause the Staff filed no comments, testimony, or a report to the Commission in the docket of this proceeding, the record is simply 'devoid of what data, information, or facts the staff reviewed or considered in support of its recommendation.' *Tongren v. Pub. Util. Comm.*, 85 Ohio St.3d 87 at 90 [706 N.E.2d 1255] (1999)." *Tongren* is inapposite. The commission's order in *Tongren* was based largely on its staff's recommendations and findings, but neither the commission's order nor the staff's recommendations and findings contained adequate evidentiary support. *Tongren*, 85 Ohio St.3d at 90–91, 706 N.E.2d 1255. In this case, the PUCO's order is sufficiently supported by evidence admitted at the hearing.

{¶ 51} Vectren also argues that, even presuming that the staff is authorized to examine persons under oath pursuant to R.C. 4903.02, the staff "may present the information thus acquired only by report to the Commission or in testimony in a Commission proceeding as dictated by R.C. 4901.16." According to Vectren, "Ohio law and Commission rules dictate that Staff must make its recommendations to the Commission in the public evidentiary record by report or testimony as required by R.C. 4901.16."

{¶ 52} Vectren's reliance on R.C. 4901.16 is misplaced. R.C. 4901.16 provides that no PUCO employee or agent is permitted to disclose information acquired in the course of his or her duties except as provided therein. Specifically, the statute prevents employees or agents of the PUCO who examine the accounts, records, or memoranda kept by public utilities pursuant to R.C. 4905.13 from divulging information regarding "the transaction, property, or business" of the public utility other than in reports to the PUCO or testimony in court or commission proceedings. Contrary to Vectren's assertion, R.C. 4901.16 does not preclude the PUCO's staff from presenting evidence through the cross-examination of witnesses or from advancing its theory of the case in its brief. R.C. 4901.16 imposes a duty of confidentiality on PUCO employees and agents; it does

not purport to govern the procedures for presenting evidence or filing briefs in PUCO proceedings.

{¶ 53} Finally, Vectren makes assorted claims that the proceedings before the commission were somehow tainted or that it was not afforded due process. These claims are without merit. This gas-cost-recovery proceeding centered around Liberty's audit report, of which Vectren had ample notice. Vectren had a full hearing before the commission. It was permitted to present evidence through the calling of its own witnesses, the cross-examination of the other parties' witnesses, and the filing of exhibits. Vectren was also able to argue its position through the filing of posthearing briefs and challenge the PUCO's findings through an application for rehearing. Based on the foregoing reasons, we reject Vectren's third proposition of law.

## Proposition of Law No. IV

### *ProLiance Contract*

{¶ 54} In its fourth proposition of law, Vectren challenges the PUCO's findings in relation to its asset-management agreement with ProLiance. Upon acquiring DP & L's gas assets in 2000, Vectren had in place an asset-management contract with ProLiance, an affiliate of Vectren's parent corporation. The agreement provided that ProLiance would provide all gas supply for Vectren's requirements and that Vectren would assign all pipeline contracts to ProLiance. Any pipeline capacity not used to provide service to Vectren customers could be remarketed by ProLiance, in which event it would pay Vectren a transportation credit, which Vectren could pass on to its customers.

{¶ 55} Other terms of the contract included Vectren's right to recall capacity for assignment to its gas-choice customers, and Vectren's ability to periodically require certain reductions in the amount of capacity demanded. The agreement additionally required Vectren to pay ProLiance annual fees for the management services, the first being $450,000.[8]

{¶ 56} The PUCO held that the Vectren–ProLiance contract was not prudent, reasonable, or appropriate. As a result, the PUCO ordered Vectren to refund $1.98 million to Vectren's customers for the ProLiance contract.[9] The PUCO found that the ProLiance agreement yielded substantially less revenue for Vectren's customers than the same assets had provided to DP & L's customers in DP & L's asset-management contract with Columbia Energy Services two years earlier. Additionally, the PUCO found that the capacity-reduction right con-

---

8. The management fee is included in Vectren's base rates, as opposed to its gas-cost-recovery rates, and was therefore beyond the scope of the gas-cost-recovery proceeding.

9. The PUCO originally ordered a $3.83 million adjustment but reduced that amount on rehearing.

tained in the ProLiance agreement was of little or no value because Vectren could have achieved the same results by simply allowing its existing pipeline capacity contracts to expire.[10] The PUCO also determined that Vectren relied too readily upon ProLiance's expertise and could have better monitored its asset manager to ensure that Vectren's duties and obligations to its customers were being met.

{¶ 57} Vectren first maintains that the PUCO's "$1.98 million disallowance rests, essentially, on an unsupported claim that [Vectren] was imprudent for not engaging in a competitive solicitation process prior to selecting ProLiance." Vectren contends that to arrive at the disallowance, the commission must have implicitly concluded that if Vectren had used a competitive bid process, it would have obtained substantially more revenue from the transfer of the pipeline-capacity rights.

{¶ 58} Contrary to Vectren's claim, the PUCO specifically noted that it would not declare the ProLiance contract unreasonable simply because it was not the result of a competitive bid. Rather, the PUCO presumed that Vectren had acted prudently when it contracted with ProLiance but found that the presumption was rebutted. The primary reasons cited by the PUCO for the ProLiance disallowance were (1) that the ProLiance contract generated much less revenue than the DP & L asset-management contract, (2) that the differences between the time, terms, and conditions of the two asset-management agreements were insufficient to justify the revenue difference, and (3) that Vectren needed to improve oversight of its asset manager in order to better evaluate whether it received the benefit of its bargain.[11] In short, Vectren ignores the credible evidence, unrelated to the lack of a competitive bid, that the PUCO cited to justify its rejection of the ProLiance agreement.

{¶ 59} Vectren also claims that the PUCO ignored unrebutted evidence of the market value of the released pipeline-capacity rights. Vectren presented evidence to the commission that it received $3,446,220 from the ProLiance contract during the audit period while the fair market value for the released capacity rights was $2,899,745. Vectren argues that this evidence obviated any need for the PUCO to resort to an inherently flawed comparison of the DP & L–Columbia Energy Services agreement.

---

10. The reduction-right term gave Vectren the right to reduce its capacity portfolio up to specified levels in anticipation of some customers switching to competitive suppliers. This right allowed Vectren to avoid paying for that capacity and put ProLiance at risk for using that capacity.

11. On rehearing, the PUCO accepted Vectren's claim that the restructuring of the Columbia Gas Transmission Corporation market had an effect on the market for Vectren's unused capacity and, in combination with the PUCO's adjustment in the average annual value of the DP & L contract, reduced the original disallowance of $3.83 million to $1.98 million.

{¶ 60} The PUCO's order reflects that it considered Vectren's evidence but found other evidence more persuasive. Specifically, the PUCO found that Vectren's "market analysis" was flawed because it did not consider the higher market value contained in the DP & L–Columbia Energy Services agreement. It also noted that in negotiating its asset-management agreement with ProLiance, Vectren failed to recognize that ProLiance had the ability to maximize revenues generated from unused capacity by combining that capacity with other commodities. In that regard, the PUCO cited Vectren's failure to track whether ProLiance repackages the unused capacity from Vectren with other commodities.

{¶ 61} The PUCO recognizes, as Vectren argued, that differences between the Vectren–ProLiance and the DP & L–Columbia Energy Services agreements could arguably justify the different compensation levels for the unused capacity between the two contracts. In the end, however, the PUCO concluded that it was logical to compare the two asset-management agreements because they involved virtually the same assets and were relatively contemporaneous with one another and that Vectren failed to prove that differences between the two contracts justified the different revenue levels.

{¶ 62} We find that Vectren has offered no evidence or argument that the PUCO's decision was unlawful or unreasonable. We also conclude that the commission's findings are not manifestly against the weight of the evidence. See *Cincinnati Gas & Elec. Co. v. Pub. Util. Comm.* (1999), 86 Ohio St.3d 53, 58, 711 N.E.2d 670; *Cincinnati v. Pub. Util. Comm.* (1993), 67 Ohio St.3d 523, 528–529, 620 N.E.2d 826. Vectren is, in essence, asking us to reweigh the evidence and substitute our judgment for that of the PUCO; we decline the invitation. See *Payphone Assn. v. Pub. Util. Comm.,* 109 Ohio St.3d 453, 2006-Ohio-2988, 849 N.E.2d 4, at ¶ 16. Here, the record contains sufficient evidence supporting the PUCO's decision. Thus, we overrule Vectren's fourth proposition of law.

## Conclusion

{¶ 63} For the reasons explained above, we hold that each of Vectren's four propositions of law is without merit, and we affirm the PUCO's orders.

Orders affirmed.

MOYER, C.J., SLABY, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

LUNDBERG STRATTON, J., concurs in part and dissents in part.

LYNN C. SLABY, J., of the Ninth Appellate District, was assigned to sit for RESNICK, J., whose term ended on January 1, 2007.

CUPP, J., whose term began on January 2, 2007, did not participate in the consideration or decision of this case.

LUNDBERG STRATTON, J., concurring in part and dissenting in part.

{¶ 64} I concur in the majority opinion with regard to the first three propositions of law. However, I dissent from the majority's decision to affirm the commission's order requiring that Vectren refund $1.98 million to its customers in relation to Vectren's asset-management contract with ProLiance. While the commission upon reconsideration did reduce the refund it initially found was due, from $3.83 million to $1.98 million, I believe that the record does not justify *any* commission-ordered refund based on the ProLiance contract.

{¶ 65} As the majority explains, the commission disallowed the ProLiance contract primarily because it yielded much less revenue for Vectren's customers than the same assets had provided to DP & L's customers under DP & L's asset-management contract with Columbia Energy Services two years earlier. However, in my view, the commission erred when it used the DP & L–Columbia Energy Services contract as a basis to evaluate the reasonableness of the ProLiance contract. While the commission found that differences between the two contracts did not justify the different revenue levels, I believe that there are significant differences in the purpose, terms, and conditions of the ProLiance and DP & L contracts that make any comparison inherently flawed.

{¶ 66} First, the ProLiance contract served purposes beyond maximizing revenues. For instance, unlike the DP & L contract, Vectren's agreement with ProLiance included contractual rights supporting its Customer Choice Program. Under this program, Vectren (1) sells peaking services to Customer Choice suppliers, (2) makes pipeline storage available to Choice suppliers, (3) offers pipeline capacity to Choice suppliers, and (4) plans deliveries in a manner to ensure continued system reliability if a Choice supplier defaults. In short, Vectren designed a capacity-management strategy to support customer choice, and it entered into the ProLiance agreement as a means of enhancing the success of its Customer Choice Program.

{¶ 67} Other differences between the ProLiance and DP & L contracts justified the lower revenues generated by the ProLiance contract. For example, under the agreement, ProLiance paid Vectren approximately $1.5 million per year for the right to remarket its capacity. Yet Vectren retained the right to recall capacity from ProLiance and assign it to Customer Choice suppliers, which allowed Vectren to maintain control of capacity that might be needed to support its Customer Choice Program. This required ProLiance to assume more risk regarding the unused capacity, which in turn reduced the value of the asset-management contract to ProLiance.

{¶ 68} Similarly, the ProLiance agreement provided Vectren with valuable capacity-reduction rights that were not included in the DP & L agreement. The

reduction rights allowed Vectren to reduce its capacity portfolio up to specified levels in anticipation of Vectren's customer base switching to competitive suppliers. As a result, Vectren was able to mitigate both gas costs and stranded costs associated with customer migration to the Customer Choice Program and further facilitate the program. Moreover, the risk of remarketing the excess capacity was again shifted to ProLiance because Vectren no longer had to pay this cost when it reduced its capacity portfolio.

{¶ 69} In addition, Vectren was not required to provide a refund to ProLiance in the event that Vectren recalled capacity for system supply. In contrast, DP & L had to pay refunds to Columbia Energy Services whenever the capacity that Columbia Energy Services had purchased became unavailable due to DP & L's supply needs. In other words, ProLiance again assumed greater financial risk by paying Vectren for projected capacity regardless of whether this capacity was actually available for ProLiance to resell on the open market.

{¶ 70} Second, the ProLiance and the DP & L asset-management agreements were entered into at different times. Specifically, Vectren entered into its agreement with ProLiance at a time when changes to the natural gas market rendered any comparison between the contracts untenable.

{¶ 71} Evidence before the commission showed that the value of Vectren's unused capacity had declined substantially in 2000, after the DP & L–Columbia Energy Services contract and prior to the Vectren–ProLiance contract. This devaluation occurred when Columbia Gas Transmission restructured its market areas and essentially eliminated firm rights to secondary delivery points outside the Dayton area. This restructuring limited Vectren's ability to transfer unused capacity to certain markets on the Columbia Gas Transmission system. According to a Vectren witness, this action gutted the value of Vectren's unused Columbia Gas Transmission capacity, the very capacity that Columbia Energy Services had obtained from DP & L and relied upon to deliver gas cheaply to competitive Eastern markets.

{¶ 72} Admittedly, the commission did take the devaluation of the Columbia Gas Transmission market into account on rehearing when it reduced Vectren's ordered refund for the ProLiance contract from $3.83 million to $1.98 million. Yet the commission continued to use the flawed comparison between the two agreements as the foundation for the refund order.

{¶ 73} Even without the differences between the two contracts, market data during the audit period revealed that the compensation ProLiance paid for the right to remarket Vectren's unused capacity was reasonable. Vectren submitted evidence that it received $3,446,220 from the ProLiance contract during the audit period, while the fair market value for the released capacity rights was $2,899,745. Vectren also presented evidence from after the audit period that

showed that Vectren had secured reasonable value from ProLiance for its capacity in a diminishing market.

{¶ 74} Finally, Vectren reasonably made a conservative, less risky selection when it chose ProLiance as an asset manager. Vectren selected ProLiance because ProLiance was an affiliate of Vectren's parent corporation. Thus, Vectren was able to better monitor ProLiance's risk policies and financial viability. Indeed, Vectren presented evidence that of the portfolio managers identified as potential candidates, many had either entered bankruptcy, were no longer in business, or had been implicated in various investigations of price manipulation.

{¶ 75} In sum, the record reflects that Vectren made a prudent and reasonable decision to enter into an asset-management contract with ProLiance. The ProLiance contract allowed Vectren to obtain fair market value for its unused capacity while shifting much of the risk of remarketing that capacity to ProLiance. Comparison to the DP & L–Columbia Energy Services contract is simply unwarranted. I would therefore reverse the commission's order requiring that Vectren refund $1.98 million to its customers for the ProLiance contract. Instead, I would hold that Vectren is not required to refund any gas costs recovered through the ProLiance contract. Accordingly, I concur in part and dissent in part.

---

McNees, Wallace & Nurick, L.L.C., Samuel C. Randazzo, Gretchen J. Hummel, Lisa G. McAlister, and Daniel J. Neilsen, for appellant.

Marc Dann, Attorney General, and Duane W. Luckey, Werner L. Margard III, and Thomas G. Lindgren, Assistant Attorneys General, for appellee Public Utilities Commission of Ohio.

Janine L. Migden–Ostrander, Ohio Consumers' Counsel, and Joseph P. Serio and Ann M. Hotz, Assistant Consumers' Counsel, for appellee Ohio Consumers' Counsel.