TRAUTWEIN, TRUSTEE, ET AL., APPELLEES, *v.* SORGENFREI, EXEC. DIR., ET AL., APPELLANTS.

(No. 78-1294—Decided June 27, 1979.)

---

494

*Messrs. Hanna & Hanna* and *Mr. M. Shad Hanna*, for appellees.

*Messrs. Ritter, Boesel, Robinson & Marsh* and *Mr. William S. McCready*, for appellants.

CELEBREZZE, C. J. The fundamental issue examined by both the trial court and the Court of Appeals concerns the concept of *res judicata* and its application to the record before us. The doctrine of *res judicata* is separated into two distinct principles as explained by this court in *White-*

*head* v. *Genl. Tel. Co.* (1969), 20 Ohio St. 2d 108, at page 112:

"The doctrine of *res judicata* involves two basic concepts. *Norwood* v. *McDonald* (1943), 142 Ohio St. 299, 52 N. E. 2d 67. First, it refers to the effect a judgment in a prior action has in a second action based upon the same cause of action. The Restatement of the Law, Judgments, Section 45, uses the terms 'merger' and 'bar'. If the plaintiff in the prior action is successful, the entire cause of action is 'merged' in the judgment. The merger means that a successful plaintiff cannot recover again on the same cause of action, although he may maintain an action to enforce the judgment. If the defendant is successful in the prior action, the plaintiff is 'barred' from suing, in a subsequent action, on the same cause of action. The bar aspect of the doctrine of *res judicata* is a sometimes called 'estoppel by judgment.' Restatement of the Law, Judgments, Section 45, comment (b).

"The second aspect of the doctrine of *res judicata* is 'collateral estoppel.' While the merger and bar aspects of *res judicata* have the effect of precluding a plaintiff from relitigating the same cause of action against the same defendant, the collateral estoppel aspect precludes the relitigation, in a second action, of *an issue* that has been actually and necessarily litigated and determined in a prior action which was based on a different cause of action. Restatement of the Law, Judgments, Section 45, comment (c), and Section 68 (2); *Cromwell* v. *County of Sac* (1876), 94 U. S. 351. In short, under the rule of collateral estoppel, even where the cause of action is different in a subsequent suit, a judgment in a prior suit may nevertheless affect the outcome of the second suit."

Both aspects of *res judicata* were raised in appellants' motion to·dismiss although the trial judge restricted his scrutiny and decision to the concept of "estoppel by judgment." The assignment of error raised in the Court of Appeals merely asserted that the granting of the motion to dismiss was against the weight of the evidence and "contrary to law." However, both facets of *res judicata*

were addressed in the briefs of the respective parties.

The Court of Appeals did not discuss the dichotomy inherent in that doctrine, but merely held that the doctrine of *res judicata* was not dispositive relying on a general definition of that term found in Bouvier's Law Dictionary. In Judge Wiley's dissenting opinion he concluded that the concept of collateral estoppel created a bar to the present suit.

In order to determine whether either aspect of *res judicata* applies it is necessary to examine the first lawsuit involving these parties. On March 4, 1976, plaintiffs-appellees James Trautwein, Trustee of the Howard Trautwein Memorial Trust, Clarence Nopper and Douglas R. Valentine, d. b. a. Haven House Manor Ltd., filed a complaint against Robert Sorgenfrei, Executive Director of Municipal Utilities, City of Bowling Green, et al., in the Court of Common Pleas of Wood County in case No. 76-CIV-55. The other defendants, also city officials, were the Utilities Engineer, the Municipal Administrator, and the members of both the Board of Public Utilities and the Department of Public Utilities. All the named defendants were charged with the operation and management of the city's sewer system.

The complaint alleged that the property of the plaintiffs had been damaged by flooding caused by the city's sewer system. In paragraph No. 5 of the complaint it was alleged that the flooding was due to a negligent failure of the defendants to perform their lawful duties creating irreparable damage to the plaintiffs to which there was no adequate remedy at law. In addition, it was alleged that the acts on the part of the defendants constituted a "taking of property without due process of law."

The complaint sought injunctive relief forbidding the addition of any new users to the sewer system served by the lift station currently servicing the plaintiffs. Moreover, it sought a mandatory injunction ordering the defendants "to immediately and forthwith rent, purchase or procure sufficient standby, supplemental or breakdown equipment

to handle the load now entering the existing pump station and all peak loads that may occur in the future * * *."

On June 15, 1976, the trial judge rendered his decision and came to the following conclusions concerning the appellees' responsibility for the flooding that had occurred:

"The facts as determined by the Court are that the plaintiff's complex or apartments and a church rectory were constructed in 1973. A sewer was connected from the complex to the existing city sewer which runs east and west along Wooster Street. The connection of the private sewer to that of the city was made at or near the lift station situated at the corner of Mercer Road and East Wooster Street. *The tap-in site was determined by the employees of the city, but the site for the complex and the elevation of the complex was determined solely by the plaintiffs without supervision or approval of any of the defendants in this action.* The city sewer was designed as a sanitary sewer, but large quantities of storm water find their way into the sewer during periods of heavy rainfall. The basement floor drains of the complex apparently were placed at an elevation below certain portions of the city sewer line, and during the springs of 1973, 1974, 1975, and 1976 the quantity of sewage and storm water in the sewer exceeded the capacity of the lift pumps, causing water and raw sewage to back up into the sewer in a sufficient volume to cause the raw sewage and water to back up into the basement apartments and into the basement of the rectory. In June of 1976, because of an electrical malfunction, the pumps in the lift station ceased to operate and again the sewage reached sufficient height in the city sewer to cause the raw sewage to back up into the drains of the basement apartments.

"Some time after the 1973 flooding situation the city installed a warning system device consisting of a red light and an audible signal which would be activiated at any time the pumps became inoperable. In addition to the visual and audible signal at the lift station, the activity of the

pumps was recorded on a graph of the Sewage Treatment Plant for the use and observation of the Sewage Treatment Plant personnel.

"* * *

"*The testimony introduced at the hearing clearly established that the plaintiffs selected the level of the basement drains. As the city's storm sewers were in use, it was known to the plaintiffs or should have been known by them that the possibility of having storm water and sewage back up into the basement was very great. The Court determines that the plaintiffs have assumed the risk of this occurrence happening during periods of heavy rains or upon a malfunctioning of equipment.*

"Assuming, therefore, that the plaintiffs accepted at the time of construction the risk of flooding, the Court is then faced with the determination of whether anything has occurred since the construction of the apartments which would have been unforeseen by the plaintiffs or which constituted an acceptance of a responsibility or duty on the part of the defendants. Since the construction of the apartment complex there have been many additional tap-ins to the Bowling Green sewer system which does add additional sewage burden to the lift station in question. However, all testimony at the hearing indicates the lift station to be adequately sized and designed to accept the volume of sewage from the existing tap-ins and from additional future tap-ins.

"* * *

"This order as set forth herein does not satisfy the desires of the plaintiffs in this cause. *The Court is sympathetic to the situation the plaintiffs find themselves in but, as indicated above, the major cause of the flooding of the plaintiffs' complex is due to the selection of the basement elevation for the complex.*" (Emphasis added.)

After the aforementioned decision was rendered, and upon the motions of the respective parties, additional exhibits and testimony were received. As a result of that supplementary evidence, on August 13, 1976, the trial

court rendered another memorandum decision once again concluding that the plaintiffs were responsible for their own misfortune. The decision stated in part as follows:

"Giving full weight to the additional information received by the Court, the Court again finds from the evidence that the flooding of plaintiffs' basement apartments and the flooding of the basement of the rectory are a direct result of the fact that the basement floor in each instance is below the overflow valve of the sewer. Since sewage, like other liquids, seeks its own level, upon a malfunctioning or an overloading of the lift station sewage will flow into the plaintiffs' basements before it will flow into the overflow. *Since the level of the overflow was established and in use long before the plaintiffs built their apartment complex, and since the level of the basement floor drains was determined not by the City of Bowling Green or its employees, but rather by the plaintiffs and the plaintiffs' employees, the Court renews its findings that the plaintiffs accepted the risk of the flooding of their basements upon malfunctioning or overloading of the lift station situated within the city sewer system.*" (Emphasis added.)

The court issued its journal entry on August 18, 1976, and capsulized its former findings by ordering and denying various aspects of the requested injunctive relief. The pertinent provisions of that entry read as follows:

"1. Plaintiffs' claim for an injunction forbidding, prohibiting, restraining and enjoining the defendants, their servants, agents and employees from permitting the addition of any new users of any portion of the sewer system of Bowling Green, Ohio, served by or going through the pump station situated at the northeast corner of Mercer Road and State Route 64 is denied.

"2. Plaintiffs' complaint for a mandatory injunction to be issued ordering the defendants, their servants, agents and employees to immediately and forthwith rent, purchase or procure sufficient standby, supplemental or breakdown equipment to handle the load now entering the existing pump station and all peak loads that may occur in the

future so that damage will not accrue to the property of plaintiff and others by said backup of sewage and storm waters is denied.

"3. The Court, however, does issue a mandatory injunction ordering the defendants, their servants, agents and employees to immediately and forthwith rent, purchase or procure sufficient standby pumps and other equipment which may be necessary to put back into operation within a reasonable time any single lift station which ceases to function properly, whether the failure is mechanical or electrical.

"4. The defendants are further and mandatorily enjoined to formulate a specific positive plan of action for city employees when one of the warning devices indicates that the water and sewage level in a lift station is rising to a level at which certain real or personal property within the city may be thereby affected adversely. The affected property owners must be notified by telephone if possible, and if not possible in some other reasonable manner such as by direct contact or by loudspeaker pronouncements."

Turning our scrutiny to the second lawsuit it is apparent that most of the 13 paragraphs that comprise the first count of the complaint are a repetition of the allegations found in the complaint filed on March 4, 1976, i. e., the negligent operation of the city's sewer system has damaged appellees' property by periodic flooding. The appellees again claim that the flooding of their property amounts to a "taking" by the city without due process or just compensation as alleged in paragraph No. 5 of the complaint filed in the first lawsuit.

However, instead of just seeking injunctive relief the appellees are also seeking a writ of mandamus to compel the city of Bowling Green to commence and complete appropriation proceedings in accordance with the statutory scheme outlined in R. C. Chapters 719 and 163.

Upon an analysis of the applicable law and the record as presented before us, we agree with Judge Wiley's dissent below that plaintiff-appellees are barred from relitigating the material issue of the city's liability for the damages

to their property by reason of collateral estoppel. Since that predetermined issue is critical to the legal sufficiency of their complaint for a writ of mandamus, the trial court was correct in dismissing it on grounds of *res judicata,* albeit for the other aspect of that concept—estoppel by judgment.

The application of the concept of collateral estoppel requires an identity of both parties and issues. *Whitehead, supra,* at page 113; *Columbus* v. *Union Cemetery Assn.* (1976), 45 Ohio St. 2d 47; *Hicks* v. *De La Cruz* (1977), 52 Ohio St. 2d 71, 74; *Werlin Corp.* v. *Pub. Util. Comm.* (1978), 53 Ohio St. 2d 76, 81. In ascertaining whether there is an identity of such parties a court must look behind the nominal parties to the substance of the cause to determine the real parties in interest. *State, ex rel. Hofstetter,* v. *Kronk* (1969), 20 Ohio St. 2d 117, paragraph two of the syllabus. Quoting Justice Douglas in *State, ex rel. Hofstetter, supra,* at page 119, we indicated that " ' " * * * identity of parties is not a mere matter of form, but of substance." ' *Sunshine Anthracite Coal Co* v. *Adkins,* 310 U. S. 381, 402."

Examining the parties named as defendants in both lawsuits the only entity missing in the first proceeding was the city of Bowling Green. However, all the named defendants in the first lawsuit were employees of the city and responsible for carrying out its obligations to the citizens of Bowling Green. Thus looking beyond the nominal parties we conclude that the city was the real party in interest in both proceedings and therefore this particular ingredient of collateral estoppel has been satisfied.

As to the identity of issues, the second paragraph of the syllabus in *Whitehead* v. *Genl. Tel. Co., supra,* reads, in pertinent part:

"However, a point of law or a fact which was actually and directly in issue in the former action, and was there passed upon and determined by a court of competent jurisdiction, may not be drawn in question in a subsequent action between the same parties or their privies. The prior judgment estops a party, or a person in privity with him,

from subsequently relitigating the identical issue raised in the prior action. (Paragraphs Nos. 2 and 3 of syllabus of *Norwood* v. *McDonald*, 142 Ohio St. 299, approved and followed.)"

As the appellants have aptly stated, a court of competent jurisdiction passed upon and determined that the primary cause of the damage to appellees' property was their selection of a basement elevation below the level of the city's existing pump station.

Furthermore, this conclusion was reiterated after the commencement of the second lawsuit in a decision rendere'd on May 31, 1977. The appellees had sought to have the defendants in the first action held in contempt for a failure to comply with the previous orders of the trial court. In holding that the city of Bowling Green was not in contempt the court once again touched on the issue of the cause of the flooding:

"*A review of this Court's previous order makes it apparent that the Court at previous hearings determined that the primary cause of flooding at the Haven House Manor was the placement of the floor drains.* The Court in its previous orders did not order the City of Bowling Green to alleviate the very unfortunate flooding of the Plaintiff's premises. The Court only ordered that the City maintain the lift stations to function properly and, if additional equipment to accomplish this was needed, it should be obtained. Furthermore, the Court required the City to institute a positive plan of action should the warning signals reveal a rising sewage level in the lift station.

"The Court having received extensive testimony finds since the order issued on June 15, 1976, and supplemented on August 13, 1976, the City of Bowling Green has obtained three new pumps and has put into operation two alert plans, one effective during normal working hours and one effective during off-duty hours. The Court further finds that the City has responded to alerts in a reasonably prompt manner and has maintained the lift stations in operable condition.

"The Court has the utmost sympathy for Mr. Valen-

tine and is reluctant to continue to place the burden upon Mr. Valentine's shoulders to alleviate this flooding problem. However, the Court finds the City has not breached the terms of the prior orders of this Court, the City has met the burden placed upon it and, therefore, this Court finds the City not to be in contempt." (Emphasis added.)

The appellees have asserted that the concept of collateral estoppel is inapplicable since the former suit was not concerned with the "interference with * * * title" of the property damaged. We disagree and find that the issue of the city's liability for that damage was nevertheless integral to both lawsuits.

Appellees have also relied on the decision of the Superior Court of Cincinnati in *Boone* v. *Cincinnati* (1902), 13 O. D. (NP) 256, affirmed without opinion in 72 Ohio St. 682 (1905), both in this court and in the Court of Appeals, for the proposition that a property owner is not precluded from bringing an action for appropriation of property where he accepted the risk of that appropriation. The fourth paragraph of the syllabus in that decision reads:

"The fact that plaintiff bought property that a city had appropriated for a street, with full knowledge of the easement of the street upon it, and after the city had expended money in the improvement thereof, has no merit as a defense in an action to compel the city to pay for the same."

Not only did this court fail to specifically address that issue by way of an opinion, but the extent of the lower court's analysis in disposing of Cincinnati's argument opposing the foregoing proposition merely indicated at 259: "As to the defendant's fourth contention, I have not been able to see any merit or equity in it."

Furthermore, the present appeal involves an alleged appropriation that took place after the appellees had constructed their buildings and not one in which property was purchased where land had already been appropriated.

This court is also not persuaded that allegations of episodes of flooding which occurred subsequent to the first lawsuit necessarily alter the prior judicial determi-

nation on the issue of liability, particularly in lieu of the fact that the city has complied with prior orders to take remedial action.

The court is aware that the overflow from a public sewer onto private property *may* constitute a taking of that property for which compensation is forthcoming. See, *e. g.*, *Masley* v. *Lorain* (1976), 48 Ohio St. 2d 334; *Norwood* v. *Sheen* (1933), 126 Ohio St. 482. However, based on a scrutiny of the particular facts and circumstances before us as they relate to the two lawsuits instituted as a result of the flooding of appellees' property, we are convinced that the doctrine of *res judicata* is dispositive of the material issues raised in the second complaint.

Since a bar to the relitigation of those issues emasculates the legal sufficiency of that complaint, the judgment of the trial court was correct, although we differ with the specific grounds on which it was based. See 5 Ohio Jurisprudence 3d 83, Appellate Review, Section 530. Accordingly, the judgment of the Court of Appeals must be reversed.

*Judgment reversed.*

HERBERT, W. BROWN, KERNS, SWEENEY, LOCHER and HOLMES, JJ., concur.

KERNS, J., of the Second Appellate District, sitting for P. BROWN, J.