[Cite as *Mt. Pleasant Blacktopping Co., Inc. v. Inverness Group, Inc.*, 2025-Ohio-284.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| MT. PLEASANT BLACKTOPPING CO., INC., | : | APPEAL NO. | C-240134 |
| | | TRIAL NO. | A-2102231 |
| | : | | |
| Plaintiff-Appellee, | | | |
| | : | | |
| vs. | | *O P I N I O N* | |
| | : | | |
| INVERNESS GROUP, INC., | | | |
| | : | | |
| Defendant-Appellant. | | | |
| | : | | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed in Part, Reversed in Part, and Cause Remanded

Date of Judgment Entry on Appeal: January 31, 2025

*Dressman Benzinger LaVell PSC*, *Kevin F. Hoskins*, *Joseph M. Kramer* and *Richard G. Meyer*, for Plaintiff-Appellee,

*Strauss Troy Co., LPA, Brian J. O'Connell*, *James D. Houston* and *Stephen E. Schilling*, for Defendant-Appellant.

**CROUSE, Judge.**

**{¶1}** This case flows from a dispute over a sewage line. The Inverness Group, Inc. ("Inverness"), the defendant-appellant in this case, is a real estate developer that engaged plaintiff-appellee Mt. Pleasant Blacktopping Company, Inc. ("MPB"), to install sewage lines in one of its housing developments. After a surprising regulatory rejection clogged up the process, the parties sought to determine who had to foot the bill for the fix. MPB prevailed following a bench trial.

**{¶2}** Inverness now contends that prior federal litigation estopped MPB from relitigating the arbitrariness of the regulatory action, that Greene County ("the County") should have been joined as a necessary party, and that the trial court misapplied several contract-law doctrines, including those set forth in *Security Sewage Equip. Co. v. McFerren*, 14 Ohio St.2d 251 (1968) (hereinafter "*Security Sewage*"). While we reject Inverness's challenges to the trial court's collateral-estoppel and joinder rulings, we agree that the trial court misapplied *Security Sewage* and the contract doctrines of substantial performance and impossibility. We therefore reverse the trial court's judgment for MPB and remand the cause for consideration under the proper framework.

## I. BACKGROUND

### A. *The Contract*

**{¶3}** Inverness is a real estate developer responsible for the Landings at Sugar Creek ("the Landings"), a housing development in Greene County, Ohio. In 2016, Inverness engaged MPB, an infrastructure contractor, to install sewer lines in Section 3 and Section 4 of the Landings in separate agreements. This case arises out of MPB's agreement to install lines in Section 4.

**{¶4}** In the written agreement, MPB promised to "obtain all permits and

licenses that may be necessary for the proper performance" of its installation duties. MPB further promised that its work would "conform to the requirements of all governmental agencies . . . having jurisdiction over the Project" and would be "in accordance with the specifications" of the same. MPB's performance would be deemed complete when it was "to the satisfaction of . . . all government agencies having jurisdiction."

{¶5} MPB also agreed that it was "responsible for testing [the sewer] system and receiving approval and acceptance from the local Sanitary Sewer Department," and for providing Inverness with proof of that acceptance. The lines MPB installed were then to be "dedicated to the appropriate governmental agency." In return, Inverness promised to pay MPB roughly $650,000 (subject to agreed-upon additions and deductions) in installments amounting to 90 percent of the work completed at the end of each month. Inverness would release the final 10 percent retainage and pay any balance upon the project's completion.

### B. The Inspection & Falling Out

{¶6} MPB's work on Section 3 of the Landings was completed and approved by December 2016. It could not begin its work on Section 4 until June 2017. After installing the Section 4 line, MPB performed the necessary testing and sought regulatory approval, just as it had for Section 3.

{¶7} Section 3.9.8 of the County's regulations regarding sanity sewer lines required the developer to flush the newly installed sanitary sewer lines with water, then send a camera through the pipes:

> [S]anitary sewers must be cleaned and televised (videotaped) by the developer or his representative prior to seventy-five percent (75%) release. The camera shall be set on skids and adjusted so that the bottom

of the lens coincides with twenty-five percent (25%) of the diameter of the sewer line being televised. All work covered in this section shall be witnessed by a Greene County Sanitary Engineering Department Inspector.

. . .

During the course of the videotaping, should the camera lens encounter standing water, the sanitary sewer in that area shall be considered unacceptable and shall be dug up and replaced.

Section 3.8 of the same regulations also permitted the County, after watching the video, to demand that a contractor remedy "any misalignment, displaced pipe, or any other defects" discovered in the pipe.

{¶8} MPB hired Tele-Vac to perform this "TV inspection" test (i.e., the video recording of the pipe). Upon reviewing the TV inspection test, Randy Gilbert, the Sanitary Engineer and Assistant Director of the Greene County Sanitary Engineering Department, informed Inverness and MPT that the lines for Section 4 had failed the inspection. Gilbert testified that the County had rejected the lines because the camera had captured "multiple bellies"—meaning multiple spans of pipe where standing water had accumulated. The interested parties discussed the issues in a meeting on January 9, 2018, after which Gilbert agreed that the County would review its determination.

{¶9} On January 26, Inverness sent MPB a notice of default, citing as its reason the County's disapproval of "significant portions of the Sanitary Sewer Work." The notice gave MPB three days to cure the breach, or else Inverness would rescind the contract and seek to recover for the cost of substitute performance, as well as any consequential damages.

{¶10} On February 8, Gilbert sent Inverness a letter reiterating that the

4

County had inspected "two spans of sewer and found that they do not meet the required standards for acceptance." Gilbert's letter stated that "[u]ntil these two spans are removed and installed to the design requirements" in the County's regulations, "no service permits will be issued for the lots intended to utilize these spans." Neither party sought review of the County's regulatory determination in the court of common pleas under R.C. 2506.01 within the 30 days allotted by R.C. 2505.07.

### C. The Federal Court Litigation

**{¶11}** Ten months later, MPB filed suit against the County and Ronald Volkerding (the director of the County's Sanitary Engineering Department) in the United States District Court for the Southern District of Ohio, and joined Inverness as a necessary party. *Mt. Pleasant Blacktopping Co. v. Greene Cty.* ("*MPB I*"), 2021 U.S. Dist. LEXIS 34162, *7 (S.D. Ohio Feb. 21, 2021). In that suit, MPB asserted claims under 42 U.S.C. 1983, alleging that the County's regulations were so vague, or else that the County and Volkerding had applied the regulations so arbitrarily, as to deprive MPB of rights secured by the Due Process and Equal Protection Clauses of the Federal Constitution. *Id.* at *7, 10. In the same federal action, MPB also brought a state-law claim against the County for tortious interference with MPB's contract with Inverness, and sought a declaratory judgment as to the meaning of the County's regulation. *Id.* at *7, 18. For its part, Inverness brought a counterclaim against MPB for breaching the contract. *Id.* at *7.

**{¶12}** The district court granted summary judgment against MPB on all its constitutional claims. *Id.* at *21. As relevant here, the district court found that the County had a rational basis for rejecting the lines based on the State's broad police powers. *Id.* at *12-13. Therefore, the court said, the "County has not acted in an arbitrary or capricious manner." *Id.* at *13. Once MPB's section 1983 claims were out,

5

the court declined to exercise its supplemental jurisdiction over the state-law claims, noting that, were it to do so, "it would be required to delve into numerous issues of local concern, including the interpretation of Greene County's Sanitary regulations." *Id.* at \*20.

{¶13} On appeal, the Sixth Circuit agreed. *Mt. Pleasant Blacktopping Co. v. Greene Cty.* ("*MPB II*"), 2022 U.S. App. LEXIS 12057 (6th Cir. May 2, 2022). Accepting MPB's theory—i.e., that the County had "'traditionally and consistently construed and applied' § 3.9.8 to mean that a sewer line was unacceptable only if the camera lens 'c[a]me into contact with' standing water in the line," and that Gilbert had cooked up the new no-standing-water ("zero-bellies") policy just for MPB—the Sixth Circuit nevertheless held that MPB had failed to meet the "heavy burden to establish either its asserted substantive due process claim or equal protection 'class of one' claim." *Id.* at \*4, 7. MPB had failed "to turn its dispute with Greene County into a constitutional tort," so the Sixth Circuit would not "needlessly second-guess[] the decisions" of the County. *Id.* at \*7. It affirmed the district court's order.

### D. The State Court Litigation

{¶14} While MPB's appeal was pending before the Sixth Circuit, MPB filed a complaint against Inverness in the Hamilton County Court of Common Pleas, seeking recovery for breach of contract and unjust enrichment, as well as declaratory judgments regarding the parties' contract obligations, the meaning of the County's regulation, and MPB's compliance with said regulation.

{¶15} Inverness responded by filing a motion to dismiss pursuant to Civ.R. 12(B)(7) for failure to join Greene County as a necessary party as required by Civ.R. 19(A) and Ohio's Declaratory Judgment Act, R.C. 2721.12. The trial court denied this motion.

**{¶16}** Inverness then filed a counterclaim for breach of contract against MPB. After discovery, Inverness sought partial summary judgment against MPB on the question of liability, asserting both that MPB's claims failed as a matter of law, and that decisions issued in their federal litigation estopped MPB from relitigating crucial issues. MPB filed a "Motion for Declaratory Judgment," which the trial court converted into a motion for summary judgment.

**{¶17}** The trial court denied both parties' motions. It rejected Inverness's collateral-estoppel arguments outright. It further found that disputes of fact regarding the foreseeability of the County's regulatory action—a determinative issue in excusing MPB's failure to obtain approval—precluded summary judgment.

**{¶18}** The case proceeded to a bench trial, at which the parties put on evidence about the parties' expectations in forming the contract—including evidence that the County had not previously interpreted its regulations so strictly, and that the stricter interpretation came after changes in County personnel and policy. The trial court ultimately ruled that MPB was excused from its duties to perform under the contract, because, "[w]hen the parties drafted their contract they could not have foreseen that a new policy that was not enacted at the time of the installation of the sewer lines, would be retroactively applied to Mt. Pleasant, inconsistently applied by various inspectors, and done so without notice. Greene County acted arbitrarily, capriciously, and unreasonably."

**{¶19}** Although the performing party under a contract generally assumes the risk that they will fail to receive regulatory approval for their efforts, and although the contract here expressly provided that MPB had to receive regulatory approval, the trial court found that the County's unforeseeable regulatory actions brought this case within an exception outlined in *Security Sewage.* It therefore awarded judgment to

MPB on its breach-of-contract claim, finding that MPB's failure to get approval was excused, and that MPB had substantially performed. Further, because Inverness never appealed the regulatory determination made by the County, the trial court held it had failed to mitigate damages. The trial court awarded MPB the full balance owed under the contract ($95,274), plus prejudgment interest from July 30, 2019–February 2, 2024 (an additional $17,954). This appeal timely followed.

## II. COLLATERAL ESTOPPEL

**{¶20}** In its first assignment of error, Inverness argues that the doctrine of collateral estoppel precluded MPB from relitigating the arbitrariness of the County's regulation—an issue Inverness claims was resolved in *MPB I*. The application of collateral estoppel is a purely legal issue, which we review de novo. *AJZ's Hauling, L.L.C. v. Trunorth Warranty Programs of N. Am.*, 2023-Ohio-3097, ¶ 16.

**{¶21}** The defense of collateral estoppel, or issue preclusion, allows a party to "estop" their opponent "from relitigating facts and issues in a subsequent suit that were fully litigated in a prior suit." *Thompson v. Wing*, 70 Ohio St.3d 176, 183 (1994). The doctrine applies when "the fact or issue (1) was actually and directly litigated in the prior action and (2) was passed upon and determined by a court of competent jurisdiction and (3) when the party against whom collateral estoppel is asserted was a party in privity with the party to the prior action." (Cleaned up.) *AJZ's Hauling* at ¶ 16. Ohio courts apply this doctrine to both factual and legal issues. *See* 63 Ohio Jur.3d, Judgments, § 364 (2024); *see also Scholler v. Scholler*, 10 Ohio St.3d 98, 105 (1984), quoting *Trautwein v. Sorgenfrei*, 58 Ohio St.2d 493 (1979), syllabus ("A point of law or a fact which was actually and directly in issue in the former action, and was there passed upon and determined by a court of competent jurisdiction, may not be drawn in question in a subsequent action . . . .").

8

**{¶22}** In this case, neither party disputes that MPB and Inverness were parties to the prior federal litigation concerning these sewer approvals, nor that the federal courts were courts of competent jurisdiction. Rather, they disagree on whether issues involved in the present case were "actually and directly litigated in the prior action." *See id.* Inverness contends that the court of common pleas passed judgment on an issue already resolved by the federal district court: whether the County's regulatory actions were "arbitrary" and/or "capricious." *Compare MPB I*, 2021 U.S. Dist. LEXIS 34162, at *13 ("Greene County has not acted in an arbitrary or capricious manner . . . ."), *with* Decision & Judgment Entry, *Mt. Pleasant Blacktopping, Co., Inc. v. Inverness Group, Inc.* ("*MPB III*"), Hamilton C.P. No. A-2102231, 1 (Feb. 2, 2024) ("Greene County acted in a manner that was arbitrary, capricious, and unreasonable.").

**{¶23}** MPB counters that the federal courts expressly declined to rule on state-law issues, including MPB's request for a construction of the regulation and Inverness's breach-of-contract counterclaim. Further, MPB says, the constitutional claims actually addressed by the federal courts concerned the application of peculiar constitutional standards. Therefore, while the decisions may have shared language, they used that language to describe entirely distinct issues.

**{¶24}** The court below rejected the application of collateral estoppel here and denied Inverness's motion for summary judgment. We agree that this was the correct result, but for a different reason than that given by the trial court.

**{¶25}** First, the trial court suggested that collateral estoppel did not apply because it possessed "concurrent jurisdiction" with the federal court over the claims. But relative jurisdictional reach has no bearing on the estoppel question in this case. Ohio preclusion law estops the relitigation of issues properly determined in earlier

9

proceedings, so long as the prior tribunal was a court of *competent* jurisdiction, which, of course, includes a federal court. *See Monahan v. Eagle Picher Indus., Inc.*, 21 Ohio App.3d 179, 181 (1st Dist. 1984) (holding that collateral estoppel applies where "identical issues raised by a plaintiff's state court complaint have been previously litigated in federal court").

**{¶26}** Second, the court below relied upon the federal district court's clarification that, "in denying [MPB's] motion for summary judgment on its claims against Inverness, the Court did not make any findings on the merits of (or standards applicable to) [MPB's] state-law claims against Inverness." Order Granting Motion to Clarify [Doc #138] at PageID 3971, *Mt. Pleasant Blacktopping Co. v. Greene Cty.*, S.D. Ohio No. 3:18-cv-417 (June 30, 2021). This clarification certainly resolved any ambiguities regarding *claim* preclusion that may have lingered following the federal court's decision.

**{¶27}** But Inverness invokes *issue* preclusion, not claim preclusion. The doctrine of collateral estoppel/issue preclusion is distinct from the doctrine of claim preclusion, which Ohio courts have historically called "estoppel by judgment," and which many other courts simply term "res judicata." *See Lycan v. City of Cleveland*, 2022-Ohio-4676, ¶ 22. A lack of claim preclusion does not necessarily determine whether a party is precluded from relitigating any particular issues already resolved. Thus, the trial court erred by categorically rejecting Inverness's collateral-estoppel argument based on the clarification order alone. Further inquiry was necessary before determining that issue-preclusion did not apply here.

**{¶28}** In affirming a judgment, we are not limited to the reasoning advanced by the lower court's order. Thus, we hold that MPB was not estopped from litigating whether the County's regulatory action was so arbitrary or irrational as to be

unforeseeable to the parties because, despite similar terminology, that issue was wholly distinct from any of the federal court's determinations regarding arbitrariness or rationality in the due-process or equal-protection senses.

**{¶29}** The case before us deals with two fundamentally different issues described by the same words. At issue in the federal case was whether the County had exceeded the bounds of its police power. This new case concerns whether the County's regulatory action was so arbitrarily unpredictable that the parties could not have foreseen its possibility. While both courts described the issues using "arbitrary and capricious" language, they addressed fundamentally different questions.

**{¶30}** The federal district court's "arbitrary and capricious" language concerned MPB's substantive-due-process challenge. *See MPB I*, 2021 U.S. Dist. LEXIS 34162, at \*10-11. And in that due-process context, federal courts have used "arbitrary and capricious" as a procedural analogy for "rational basis review." Thus, as the Sixth Circuit made clear on appeal, resolving whether the county's actions were "arbitrary and capricious," in this case, meant determining whether the County's application of its regulation had been so arbitrary, so baseless, as to "turn [MPB's] dispute with Greene County into a constitutional tort." *MPB II*, 2022 U.S. App. LEXIS 12057, at \*7. To answer this question, the district court asked (and answered) whether the County (1) had "a legitimate interest in avoiding future maintenance issues caused by defects," (i.e., the "bellies" in the water lines), and (2) whether "requiring that these defects be remedied rationally relates to this interest." *MPB I* at \*12-13. Because the County *did* have a "legitimate interest" in its pipe integrity, and because it *could* believe that replacing the pipes was "rationally related" to that interest, the district court found—and the Sixth Circuit agreed—that the County's application of its regulation had not violated the Due Process or Equal Protection Clauses. To the extent

11

that the district court found that "Greene County has not acted in an arbitrary or capricious manner," this is what it meant. *Id.* at \*13.

{¶31} The court of common pleas also used the words "arbitrary" and "capricious" in addressing the County's regulations, but employed them in assessing whether the County's regulatory "actions were so unforeseen and usual [sic] as to excuse Mt. Pleasant's performance." *MPB III*, Hamilton C.P. No. A-2102231, at 1. Despite the administrative-law flavor of the trial court's language, context shows it was addressing whether the County's regulatory action was reasonably foreseeable to MPB—not whether the County's police power was adequate to sustain the regulatory action. Had the court below adopted the federal courts' due-process determination, i.e., that the County had a nonarbitrary basis for its exercise of sovereign police power, it would have been none the wiser about whether that application was *foreseeable* to the parties. Thus, MPB was not estopped from asserting that the County's regulatory action was arbitrary in the more ordinary sense, and was therefore unforeseeable.

{¶32} Inverness emphasizes that MPB deployed much of the evidence upon which it now relies in its federal litigation, and cites *Fort Frye Teachers Assn. v. State Emp. Relations Bd.*, 81 Ohio St.3d 392, 396 (1998), for the proposition that, where "the same evidence would sustain both issues, then the two issues are the same for purposes of applying collateral estoppel."

{¶33} But the *Fort Frye* Court's broad language must be read in context. The plaintiff in *Fort Frye* sought to relitigate essentially the same question raised in a prior suit (i.e., whether their employer had declined to renew an employment contract in retaliation for protected association/union activity), under a more lenient causation standard (i.e., Ohio's "in-part" test vs. the federal "but for" causation standard). *Id.* at 396-397. To help determine whether these issues were the same, the Ohio Supreme

Court imported a rule from the claim-preclusion context: "To determine whether a second action is based upon the same cause of action as that litigated in a former action . . . under the doctrine of res judicata," courts should consider "the identity of the evidence necessary to sustain each action." *Norwood v. McDonald*, 142 Ohio St. 299 (1943), paragraph four of the syllabus, cited by *Fort Frye* at 396. The *Fort Frye* Court extended this principle to resolve its issue-preclusion dilemma, holding that the retaliation issue in the second proceeding was identical to the retaliation issue in the first, because, despite the different causation standards, "the same evidence would sustain both" retaliation theories. *Fort Frye* at 396.

{¶34} The resolution of the two issues in the federal and state cases here did not rest upon "identical facts," as Inverness suggests. While much of the evidence offered in the federal proceeding was cited by the court below, the *relevant* evidence for determining arbitrariness and caprice was not identical. The court of common pleas found, for example that "[w]hen the parties drafted their contract they could not have foreseen that a new policy that was not enacted at the time of the installation of the sewer lines, would be retroactively applied to Mt. Pleasant, inconsistently applied by various inspectors, and done so without notice." *MPB III*, Hamilton C.P. No. A-2102231, at 4. The trial court summarized this finding in its next sentence by saying that the County "acted arbitrarily, capriciously, and unreasonably." *Id.* No evidence relevant to the federal substantive-due-process issue addressed foreseeability of the policy at the time of contract formation.

{¶35} Finally, Inverness urges us to give preclusive effect to several statements or issues resolved as part of the federal district court's unconstitutional-vagueness holding. *See MPB I*, 2021 U.S. Dist. LEXIS 34162, at *17-18. But on appeal, the Sixth Circuit resolved this issue by *assuming* that the County's rejection *had* been

"arbitrary" and contradicted the regulation's "unambiguous" meaning (as MPB had contended), but nevertheless found that MPB had failed to prove the elements of an unconstitutional-vagueness challenge. *MPB II*, 2022 U.S. App. LEXIS 12057, *8-9. (noting that MPB "agrees that for more than 20 years, 'Greene County had been abiding by [a definite meaning of "encounter"],'" and that "allegedly arbitrary or inconsistent enforcement of a regulation whose terms are unambiguous does not render the regulation impermissibly vague"). The Sixth Circuit's new basis for affirming the district court's holding superseded the district court's determinations on that issue and stripped them of their preclusive effect. *See Chiaramonte v. Hardman*, 1988 Ohio App. LEXIS 2837, *4 (9th Dist. July 13, 1988) (analyzing preclusion by looking to appellate court's alternative basis of affirmance in prior action, rather than decision of trial court).

{¶36} The issues Inverness sought to estop MPB from litigating below were not identical to those litigated in the federal court. We therefore hold that the trial court was correct that Inverness could not estop MPB from litigating whether the County's regulatory enforcement was arbitrary and therefore unforeseeable. We therefore overrule Inverness's first assignment of error.

### III. FAILURE TO JOIN A NECESSARY PARTY

{¶37} In its third assignment of error, Inverness argues that the "trial court erred as a matter of law" by failing "to join the County as a necessary party" under Civ.R. 19(A) and R.C. 2721.12(A). More specifically, Inverness contends that the trial court erred in denying its motion to dismiss for failure to join under Civ.R. 12(B)(7), or, in the alternative, to order joinder.

{¶38} An appellate court reviews a decision denying a motion to dismiss for failure to join de novo. *See, e.g., Green v. Animal Protection League*, 2016-Ohio-2767,

14

¶ 21 (3d Dist.); *Gonzalez v. Graves*, 2015-Ohio-1791, ¶ 22 (6th Dist.); *Net Solutions, Inc. v. NSI Group LLC*, 2005-Ohio-5483, ¶ 33 (7th Dist.).

**{¶39}** Civ.R. 12(B)(7) permits motions to dismiss based on a plaintiff's "[f]ailure to join a party under Rule 19 or Rule 19.1." Civ.R. 19, in turn, specifies certain parties who must be joined. "[A] party's failure to join an interested and necessary party constitutes a jurisdictional defect that precludes the court from rendering a judgment in the case." *State ex rel. N.G. v. Cuyahoga Cty. Court of Common Pleas, Juvenile Div.*, 2016-Ohio-1519, ¶ 27, citing *State ex rel. Doe v. Capper*, 2012-Ohio-2686, ¶ 15.

**{¶40}** Ohio's Declaratory Judgment Act further specifies certain necessary parties in declaratory-judgment actions. "[W]hen declaratory relief is sought . . . , all persons who have or claim any interest that would be affected by the declaration shall be made parties." R.C. 2721.12(A). And, more specifically, "[i]n any action or proceeding that involves the validity of a municipal ordinance or franchise, the municipal corporation shall be made a party and shall be heard." *Id.*

**{¶41}** In its complaint, MPB prayed for three declaratory judgments, two of which are relevant here. In one request MPB sought a declaration "properly construing relevant provisions of the Regulations," and in the other, a declaration that MPB, "in installing the [sanitary sewer] lines in Section 4 of Sugar Creek, complied with all pertinent Regulations and Specifications of the Greene County Sanitary Engineering Department, properly construed."

**{¶42}** Neither of these requested declarations "involves the validity" of the County's "ordinance or franchise." The first request seeks a judicial construction divining the regulation's meaning, but would not consider its validity. And the second declaratory request turns on the *application* of MPB's regulation to the facts of this

15

case, not the validity of the regulation generally. At most, MPB's request for a declaration of its compliance could call into question the validity of the County's *application* of its regulation, but not the validity of any "ordinance or franchise."

**{¶43}** Because R.C. 2721.12(A) would require the County's joinder only if the regulation's validity were challenged, and because MPB challenged only the application of the regulation in this case, MPB was not required to join the County under Ohio's Declaratory Judgment Act or Civ.R. 19(A). As such, we hold that the trial court correctly rejected Inverness's Civ.R. 12(B)(7) motion and overrule Inverness's third assignment of error.

## IV. CONTRACT ISSUES

**{¶44}** Inverness's second and fourth assignments of error concern the substance of MPB's contract claims. In the second, Inverness contends that MPB was obligated to obtain regulatory approval for the lines it installed, and that the trial court erred in holding that *Security Sewage*, 14 Ohio St.2d 251, excused its failure to do so. And in its fourth assignment of error, Inverness contends that the trial court erred by awarding MPB damages on a substantial-performance theory, because, even if the law excused MPB's failure to obtain approval for its sewer lines, Inverness would not be obligated to pay for the excused performance.

**{¶45}** For clarity, we begin by addressing substantial performance and breach of contract (part of Inverness's fourth assignment of error), before proceeding to *Security Sewage*, excuse, and assumption of risk (the second assignment of error), and finally conclude with the issue of remedies (the balance of the fourth assignment of error).

### A. Breach & Substantial Performance

**{¶46}** In its fourth assignment of error, Inverness contends that the trial court

erred in holding that MPB was entitled to contract damages on the theory that MPB substantially performed its obligations.

**{¶47}** Whether a party substantially performed or materially breached a contract "is, at its core, a question of fact," *Finn v. Seiser*, 2024-Ohio-5288, ¶ 27 (1st Dist.), and is thus reviewed under the manifest-weight standard. *See William Powell Co. v. OneBeacon Ins. Co.*, 2020-Ohio-3270, ¶ 46 (1st Dist.). But "[w]hen the facts are undisputed, whether a party's conduct constitutes substantial performance is a question of law," which we review de novo. *Fifth Third Bank v. Ducru Ltd. Partnership*, 2006-Ohio-3860, ¶ 18 (1st Dist.).

**{¶48}** There are undisputed facts here. Both parties agree that MPB was obligated to obtain regulatory approval for the lines it installed. The contract makes clear that MPB's performance would not be complete until MPB secured that approval. Yet the County's regulatory approval was denied and never obtained. Thus, MPB failed to strictly comply with plain terms of the contract.

**{¶49}** But MPB argues, and the trial court held, that MPB *substantially* performed its contractual duties. Under the common law, substantial performance is an "'approximation of full performance, such that the parties obtain, in the main, what the contract called for, although it is not complete and final performance in every particular.'" *Fifth Third Bank* at ¶ 17, quoting *Stone Excavating, Inc. v. Newmark Homes, Inc.*, 2004-Ohio-4119, ¶ 13 (2d Dist.). A party's efforts constitute substantial performance where "the unperformed duties [do] not destroy the value or purpose of the contract" to the promisee, and where the deviations from strict compliance are "nominal, trifling, technical, slight, and consistent with an honest effort to perform." *Id.* at ¶ 18.

**{¶50}** MPB's failure to install sewer lines that met regulatory approval was a

clear breach of its obligations under the contract, not a mere "trifling" or "technical" nonconformity that would leave Inverness with the substantial benefits of its bargain. Indeed, the repairs to render the lines compliant with regulatory (and therefore contractual) obligations were so expensive that MPB asserts making them compliant would be legally impossible for it. MPB cannot now turn around and say that those same noncompliant sewers, in need of the same replacements and repairs, were functionally equivalent to the compliant lines Inverness was promised.

**{¶51}** MPB has thus failed to discharge its duties under the contract by substantial performance. Unless MPB's nonperformance was excused, or its obligation otherwise discharged, MPB was in breach.

### B. Security Sewage *& the Excuse of Regulatory Impossibility*

**{¶52}** Following a bench trial, the court below found that MPB's nonperformance was excused, because an unexpected regulatory rejection prevented it from satisfactorily performing its duties under the contract.[1] Inverness now challenges that determination, contending that unforeseen regulatory actions do not excuse contractually assumed risks.

**{¶53}** Over 50 years ago, the Ohio Supreme Court confronted this issue, and recognized that a party's failure to obtain a license or regulatory approval will generally not excuse that party's obligations under a contract:

---

[1] Inverness frames its second assignment of error as follows: "The trial court erred as a matter of law by failing to grant Inverness' motion for summary judgment based on the binding precedent of *Security Sewage Equipment Co. v. McFerren* and creating a brand-new exception to that precedent." Although this is framed as a challenge to the trial court's denial of summary judgment, we have held that "when a trial court denies summary judgment, any error is rendered harmless by a trial on the same issues raised in the summary-judgment motion." *William Powell Co. v. OneBeacon Ins. Co.*, 2020-Ohio-3270, ¶ 22 (1st Dist.). Because the trial centered on the *Security Sewage*/foreseeability issues, we construe Inverness's second assignment of error as attacking the trial court's determinations on those questions, as expressed in its judgment entered after the bench trial. While this changes nothing about how we review legal questions, it means we review factual disputes by looking to the trial record rather than the summary-judgment record, and by applying a manifest-weight rather than a de novo standard of review.

Ordinarily, when one contracts to render a performance for which a government license or permit is required, it is his duty to get the license or permit so that he can perform. The risk of inability to obtain is on him; and its refusal by the government is no defense in a suit for breach of his contract.

*Security Sewage*, 14 Ohio St.2d at 254; *accord id.* at paragraph two of the syllabus.

**{¶54}** But this rule is not absolute. In the same breath, the high court acknowledged an exception to its general rule. In some cases, "unforeseen and unusual" regulatory action may "supervene[] in such a manner as to be beyond the seller's assumption of risk." (Cleaned up.) *Id.* at 254. In such cases, the supervening governmental action may excuse a party's nonperformance under the contract.

**{¶55}** In its second assignment of error, Inverness argues that the trial court erred in applying the *Security Sewage* exception, either because the exception only applies under the Uniform Commercial Code ("UCC"), or because it came in dicta and "Ohio's courts of common pleas are not authorized to make new law and create a brand-new exception to 55-year-old binding precedent." MPB responds that the exception was part of *Security Sewage*'s holding, and that other courts have applied its exception—including in cases governed by the common law.

**{¶56}** The scope and application of *Security Sewage* are questions of law, which we review de novo. *See William Powell Co.*, 2020-Ohio-3270, at ¶ 46 (1st Dist.).

**{¶57}** Regardless of whether the rule or exception were part of *Security Sewage*'s holding in the strict sense, both doctrines are congenial to the common law and rooted in longstanding principles of contract. The general rule in *Security Sewage* stemmed from a long line of persuasive cases and authorities. *See Security Sewage*, 14 Ohio St.2d at 254. The exception, as Inverness points out, was drawn from the text

and official comment to R.C. 1302.73—Ohio's codification of the UCC 2-615. *Security Sewage* at 253-254. Yet the UCC and *Security Sewage* did not fashion that exception from whole cloth; it was a particular application of the venerable doctrine of impossibility of performance.

**{¶58}** For more than 100 years, Ohio courts have excused certain contractual obligations where their performance has become impossible. *See*, *e.g.*, *Ross Rd. Mach. Co. v. Forbus*, 10 Ohio Dec.Rep. 217 (Cincinnati Super. Ct. 1890) (recognizing a defense of impossibility where a particular person or thing named in the contract has perished). While they have been far from precise in describing this doctrine, its two main components are clear: a party may excuse their nonperformance where (1) some event or occurrence renders a party's performance under the contract impossible in the legal sense,[2] and (2) that event or occurrence was unforeseeable, such that its non-occurrence was a basic assumption of the bargain. *See*, *e.g.*, *Lehigh Gas-Ohio, L.L.C. v. Cincy Oil Queen City, L.L.C.*, 2016-Ohio-4611, ¶ 15 (1st Dist.) ("[T]he doctrine [of impossibility of performance] excuses performance under a contract because it has been rendered impossible due to the occurrence of an unforeseeable event."). *See also*, *e.g.*, *MTH Real Estate, LLC v. Hotel Innovations, Inc.*, 2007-Ohio-5183, ¶ 20 (2d

---

[2] Ohio's common law is not clear as to whether courts should apply the "impossibility" standard or the modern "impracticability" standard contained in the Second Restatement of Contracts to such excuse defenses. This court has noncommittally noted that "Ohio appears to adhere to the stricter standard of *impossibility* rather than the modern standard of impracticability adopted by the Restatement." *J.I.L. One, L.L.C. v. Kemper*, 2014-Ohio-4932, ¶ 18 (1st Dist.). However, some Ohio courts use the terms and standards interchangeably. *See*, *e.g.*, *Jenkins v. State Farm Fire & Cas. Co.*, 2012-Ohio-6076, ¶ 36 (5th Dist.). Further, Ohio's model jury instructions have, for at least the past 20 years, stated that "[m]odern law only requires that performance be impracticable, which necessarily includes impossibility." *Compare* 1 *Ohio Jury Instructions*, CV § 501.17, 501.19 (Rev. Apr. 17, 2021); *with Ohio Jury Instructions Archive (2004)*, CV § 253.17, 253.19. Because the difference does not alter our resolution of this case, we leave it for another day. Of course, the commercial-impracticability standard applies to cases within the UCC, regardless of the standard under the common law. *See* R.C. 1302.73. *See also Corbin on Ohio Contracts*, § 74.06 (2024). As we are concerned with the general principle here, and as the standard varies from context to context, we defer to the language used in describing particular cases.

Dist.); *J.J.O. Constr., Inc. v. Baljak*, 2007-Ohio-4126, ¶ 13 (10th Dist.).

**{¶59}** The *Security Sewage* exception simply applies this principle to cases where the unforeseen event or occurrence was governmental action. The "'supervening act of state' exception" was one of "the classic excuses for nonperformance at common law." *Corbin on Ohio Contracts*, § 76.01 (2024). While the doctrine traditionally applied to "any performance that became unlawful due to a change in the law," *id.*, modern courts and commentators have recognized its application to any regulation that renders performance impossible (or impracticable) in the legal sense. *See, e.g., id.* at § 76.01 and 76.05; 14 *Corbin on Contracts*, § 76.6 (2023); 2 Restatement of the Law 2d, Contracts, § 261, 264 and Comment b (1981); R.C. 1302.73 and Comment 10. And, while *Security Sewage* relied on the UCC's comment, several of our sister districts have applied *Security Sewage* and its exception to contract disputes outside the UCC context. *See, e.g., Atelier Dist. v. Parking Co. of Am., Inc.*, 2007-Ohio-7138, ¶ 36 (10th Dist.) (applying *Security Sewage* rule to building and demolition contract); *Glickman v. Coakley*, 22 Ohio App.3d 49, 52 (8th Dist. 1984) (citing *Security Sewage* while noting, in context of an option contract to purchase shares, that "[a]bsent contrary contractual terms, either party can often avoid an agreement when governmental activity renders its performance impossible or illegal"); *Assn. of Cleveland Fire Fighters, Local 93 of the Internatl. Assn. of Fire Fighters v. City of Cleveland*, 2010-Ohio-5597, ¶ 13-14 (8th Dist.) (applying *Glickman* to a collective-bargaining agreement); *Mitchell v. Thompson*, 2007-Ohio-5362, ¶ 23-24 (4th Dist.) (citing *Glickman* while excusing performance based under a lease contract based on regulatory impossibility).

**{¶60}** While the regulatory-impossibility excuse shares the two main elements of an ordinary impossibility defense, the regulatory flavor comes with two important

addenda. First, there may be presumptions applicable to regulatory actions—such as the principal rule of *Security Sewage*, that a promisor who agrees to perform a task requiring licensure will generally assume the risk of nonapproval. Second, a party claiming regulatory impossibility must show that they attempted in good faith to comply with the dictates of the law *and* their obligations under the contract. 2 Restatement § 264, Comment b; R.C. 1302.73 and Comment 10. This good-faith obligation includes a duty to "attempt[], where appropriate to avoid [the regulation's] application." 2 Restatement § 264, Comment b.

{¶61} Thus, a party asserting a defense of regulatory impossibility or impracticability—including under the exception to *Security Sewage*—must show (1) that a supervening regulatory action has occurred, (2) that the action was unforeseeable so as to undermine a basic assumption of the bargain, taking into account the parties' assumption of risk and the realities of industry practice, (3) that the action rendered performance impossible or impracticable under the relevant legal standard, and (4) that the party claiming excuse attempted in good faith to comply with or avoid the application of the relevant regulation.

{¶62} No one doubts that a regulatory action has occurred here—namely the rejection of the lines by the County. And the trial below focused almost exclusively on the second element, with the trial court finding that the regulatory application at issue here was unforeseeable. While Inverness has expressed many opinions on this point, it acknowledged at oral argument that none of its assignments of error expressly challenged the trial court's factual determinations, which we would consider "under a manifest-weight standard of review." *United States Fire Ins. v. Am. Bonding Co.*, 2016-Ohio-7968, ¶ 16 (1st Dist.).

{¶63} Inverness asserts that MPB assumed the risk of regulatory nonapproval

under the plain language of the contract. The contract requires MPB to "obtain all permits and licenses that may be necessary for the proper performance" of its installation duties, to "conform to the requirements of all governmental agencies having jurisdiction over the Project," and to work "in accordance with the specifications" of the same. MPB's performance had to be "to the satisfaction of . . . all government agencies having jurisdiction." MPB also agreed that it was "responsible for testing [the sewer] system and receiving approval and acceptance from the local Sanitary Sewer Department," and for providing Inverness with proof of that acceptance.

{¶64} All of this language clearly threw upon MPB the risk of ordinary regulatory nonapproval. But none clearly covered the risk of unpredictably arbitrary or absurd actions. Inverness believes that MPB assumed all conceivable risk of regulatory nonapproval under these provisions, so that *any* failure to receive approval would constitute a breach by MPB. Under this view, MPB would be in breach—and therefore liable for consequential and other damages—if the County had rendered performance utterly and arbitrarily impossible by, for example, banning the installation of any sewers whatsoever before the Section 4 installation had begun. Put another way, Inverness believes that MPB took on a duty to insure its project against even unpredictable regulatory actions pertaining to approval and licensure. While MPB *could have* bargained to assume such absurd and unforeseeable risk, we would expect a clearer indication of the parties' intent on this score.

{¶65} While this case is a far cry from the total-sewer-ban scenario, the principle remains the same: risks that are truly unforeseeable to the parties are not assumed, absent clear evidence to the contrary. In a world of ever-changing regulations, the burden to show unforeseeability will generally be quite high—most

contracting parties can foresee the possibility of regulatory caprice and shifting political tides, even if they don't know how those tides will shift. Here, however, we rely upon the trial court's unchallenged factual finding that the regulatory action was unforeseeable and the risk therefore unapportioned.

**{¶66}** The problem is that the trial court's findings stop there. While unforeseeability is a necessary element of a regulatory-impossibility excuse, it is not sufficient to justify excusing performance. Indeed, if foreseeability were the end-all-be-all, every novel tax or unusual permit restriction might excuse the performance of countless promisors. The performance must also have been rendered impossible or impracticable.

**{¶67}** Although the Ohio Supreme Court failed to emphasize the impossibility/impracticability component in *Security Sewage*, this can hardly come as a surprise. First, the Court in *Security Sewage* found that the regulatory rejection *had been* foreseeable, and therefore the nonperformance was not excused. *Security Sewage*, 14 Ohio St.2d at 253. Second, the regulatory denial in *Security Sewage* was a blanket rejection of licensure, not a demand that an installation be brought up to code. *Id.* at 252. Without a license, the construction of a new facility was obviously "impossible."

**{¶68}** Here, however, things are not so clear. MPB's sewer lines were rejected because they did not conform to the County's then-current regulatory interpretation. However surprising or novel MPB claims the interpretation was, the County's new instructions were clear: zero bellies equals approval. MPB offered no evidence that altering or replacing its lines to bring them into compliance would have been physically impossible or violative of some other law.

**{¶69}** The problem came down to money. In May of 2019, MPB furnished

Inverness with two proposals to replace the nonconforming spans at Section 4 of the Landings. The lower of the two proposals ran around $240,000, which Denny Benson, an employee of MPB, testified was his estimate of "the complete cost to remove and replace all the pipe that had been rejected." This sum is roughly 31 percent of the total amount promised MPB in the contract, which, once adjusted to include the approved change orders and exclude the work not performed, came to approximately $765,000.

**{¶70}** That $240,000 is a sizable sum, but "[a] party cannot be excused from performance merely because performance may prove difficult, burdensome, or economically disadvantageous." *Stand Energy Corp. v. Cinergy Servs.*, 144 Ohio App.3d 410, 416 (1st Dist. 2001), citing *State ex rel. Jewett v. Sayre*, 91 Ohio St. 85 (1914). Courts are traditionally reticent to treat mere increases in cost as rendering contractual performance "impossible" or even "impracticable."

**{¶71}** At oral argument, counsel for MPB contended that they did not need to show impossibility or impracticability to prevail—unforeseeability was enough. This is legally incorrect, and the trial court erred in deciding the case on a similar assumption. On its own, we cannot say that a price hike—even a 31 percent increase—rendered performance truly "impossible" as a matter of law. Whether installing and replacing the pipes was truly "impossible" in the legal sense involves factual considerations, which we leave to the trial court in the first instance.

**{¶72}** The trial court also did not address whether MPB did all that "good faith" required in attempting to comply with or avoid the regulations. *See* 2 Restatement, § 264, Comment b. For instance, if MPB possessed a right of direct appeal from the County's regulatory decision, and if MPB had nonfrivolous arguments that the regulatory action was unlawful, then MPB may have been obliged to seek direct appellate review before asserting its impossibility excuse. However, if Inverness

possessed the sole right of appeal, or if some impediment precluded the filing of an appeal to the relevant court of common pleas, then good faith may have imposed no such requirement. In either case, such a good-faith mandate may incentivize parties to pursue appeals and regulatory relief through proper channels, where possible, before seeking to excuse their contractual nonperformance by simply blaming the County's regulatory decisions.

**{¶73}** The trial court erred as a matter of law by applying the regulatory-impossibility exception discussed in *Security Sewage* without making findings of fact or conclusions of law on two of the three prongs required to excuse performance under that doctrine. Thus, to the extent that Inverness's second assignment of error contends that the trial court misapplied *Security Sewage*, that assignment of error is sustained.[3] The cause will be remanded for consideration of whether the County's regulatory action truly rendered performance legally impossible, and whether MPB did all that good faith required before asserting its impossibility excuse.[4]

### C. Remedies in Impossibility Cases

**{¶74}** The balance of Inverness's fourth assignment of error contends that the trial court erred in awarding damages to MPB, as contractual damages are not available to a party excused from performing by impossibility. While the amount of damages awarded is reviewed for an abuse of discretion, *see Sanders v. Clark*, 2016-Ohio-7267, ¶ 14 (11th Dist.), the legal availability of particular remedies or

---

[3] Inverness's second assignment of error read as follows: "The trial court erred as a matter of law by failing to grant Inverness' motion for summary judgment based on the binding precedent of *Security Sewage Equipment Co. v. McFerren* and creating a brand-new exception to that precedent." We construe this as a more general attack on the trial court's application of *Security Sewage* and the principles expressed therein, and sustain the assignment of error on those grounds. But, to the extent the assignment asserts that the trial court erred in applying the regulatory-impossibility excuse described in *Security Sewage* at all, or in recognizing a common-law exception to the general rule set forth in that case, the second assignment of error is overruled.

[4] We leave to the trial court's discretion whether to make these findings and conclusions based on the existing record, or whether fairness requires further proceedings.

26

categories of damages constitutes a question of law, which we review de novo. *See K.R.G. Inc. v. Patel*, 2008-Ohio-5446, ¶ 9 (9th Dist.), quoting *McEnteer v. Moss*, 2005-Ohio-2679, ¶ 6 (9th Dist.) ("'[T]he kind and maximum amount of damages that may be awarded' is a question of law that this Court reviews de novo." (Bracketed text in original.)); *Sharp v. Andisman*, 2010-Ohio-4452, ¶ 33 (9th Dist.) ("Whether special damages were appropriate is a question of law.").

**{¶75}** We have already held that MPB did not substantially perform its contractual duties. We have also held the trial court erred in its application of *Security Sewage* and the excuse-of-performance doctrine by failing to consider whether the regulatory action rendered performance impossible, and whether MPB made good-faith efforts to avoid its application. However, even if MPB manages to clear the high threshold for its impossibility claim on remand, it still would not be entitled to the contract damages it received below.

**{¶76}** Impossibility—including regulatory impossibility—is an excuse; it discharges an unperformed contractual duty. In other words, an impossibility excuse saves a nonperforming promisor, who would otherwise be in breach of their contract and obliged to make the promisee whole, from having to bear the promisee's losses—whether consequential, incidental, or otherwise. But once a promisor's duty is discharged by such an excuse, the promisee's reciprocal duties—including the duty to pay—are likewise discharged. *See Corbin on Ohio Contracts*, § 78.02; 2 Restatement, § 237 and 267. Put simply, if it was impossible for MPB to give Inverness what it bargained for, then Inverness need not pay for that which it did not get. *See Lehigh Gas-Ohio, LLC*, 2016-Ohio-4611, at ¶ 15 (1st Dist.) (holding that impossibility excuse "cannot be used . . . as a means of recovering damages under a contract").

**{¶77}** Thus, if the trial court determines that MPB was excused from obtaining

regulatory approval because of impossibility, Inverness may not claim ordinary breach-of-contract damages, and MPB may not seek the money Inverness promised to pay it for those County-approved sewer lines.

**{¶78}** But there may be other remedies available. The cases and authorities agree that, generally, when a party's nonperformance is excused as impossible, the proper monetary remedy (if any) is restitution to compensate partial performance to the degree such performance has benefited the promisee. *See J.I.L. One, L.L.C. v. Kemper*, 2014-Ohio-4932, ¶ 21 (1st Dist.), citing 2 Restatement, § 266, Comment a. *See also* 14 *Corbin on Contracts*, § 78.6 and 78.9; *Corbin on Ohio Contracts*, § 78.05.

**{¶79}** We therefore hold that the trial court erred in awarding breach-of-contract damages based on excused performance. And because we have already held that MPB did not substantially perform under the contract, regardless of its excuse of performance, we sustain Inverness's fourth assignment of error. We do not decide, however, whether MPB's nonperformance should have been excused. Nor do we resolve whether, if excused, MPB or Inverness would be entitled to restitution or other relief. We leave these questions to the trial court, which is best positioned to sift through the facts and make such findings.

\* \* \*

**{¶80}** For the foregoing reasons, we sustain Inverness's second and fourth assignments of error, but overrule its first and third. We therefore affirm the judgment of the trial court in part, reverse it in part, and remand the cause for further proceedings consistent with this opinion.

Judgment affirmed in part, reversed in part, and cause remanded.

**BOCK, P.J.,** and **WINKLER, J.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.